LYMAN-RICHEY SAND & GRAVEL COMPANY, APPELLEE, V. STATE OF NEBRASKA ET AL., APPELLANTS.

FILED JULY 29, 1932. No. 28437.

C. A. *Sorensen*, *Attorney General*, and L. *Ross Newkirk*, for appellants.

*Abbott, Dunlap & Corbett, contra.*

Heard before GOSS, C. J., DEAN, EBERLY, DAY and PAINE, JJ., and BEGLEY and BLACKLEDGE, District Judges.

PAINE, J.

This is an appeal from a judgment rendered in the district court for Lancaster county for $4,006.46 against the state of Nebraska, together with an order directing the auditor of public accounts to issue and deliver a warrant to the appellee for said amount.

The extensive bill of exceptions in this case carries with it, as exhibit 5, the transcript of the proceedings had before the state auditor and secretary of state upon this claim, in which appears the original contract and specifications, making up a printed book of some 150 pages, which contract was entered into October 15, 1930, between the county of Douglas, by the chairman of its county board, and the department of public works of the state of Nebraska, by R. L. Cochran, its state engineer, as parties of the first part, and the Yant Construction Company, by its president, R. C. Yant, as party of the second part, for the paving by said construction company of state highway project No. 664-B, known as the Maple Street Road, which

paving extended five miles east from the intersection of that road with the Lincoln Highway, and lying northeast of the village of Elkhorn in Douglas county, Nebraska.

The case was brought to the district court on appeal from a decision of the auditor of public accounts and secretary of state, disapproving said claim of $4,006.46 to the amount of $2,643.49, but approving it as to the balance, of $1,362.97. Upon appeal, the case was tried in the district court for Lancaster county, without a jury, under the provisions of section 27-319, Comp. St. 1929, giving the district court jurisdiction to try appeals upon claims so disallowed.

It is admitted by the pleadings that this entire contract for five miles of paving was completed, according to its terms, within the time provided, and that the total contract amounted to the sum of $100,836.94, and that the deduction of $2,643.49, made by the state engineer from the last payment, without notice, is based upon the following provision of the contract, found in next to the last paragraph therein: "That it is mutually understood and agreed by the parties to this contract: That if the freight rates on materials required to complete this contract are increased after the date of the receipt of bids and before the date set for completing the work, the contractor will be paid extra an amount equal to the amount of the increase in freight rates on the materials required to complete this contract, likewise that deductions will be made should freight rates be decreased during said period." That soon after receiving the contract from the state for this five miles of paving, Mr. Yant had received a bid from the Lyman-Richey Sand & Gravel Company to deliver the proper mixture of sand and gravel, referred to hereafter as "sand-gravel," required under the contract, but, as Mr. Yant had leased a gravel pit in the vicinity, he did not finally decide whether to furnish the sand-gravel from his leased pit, or to contract with the Lyman-Richey Sand & Gravel Company until March 11, 1931, when he entered into a contract with that company to furnish all sand-gravel

for $11,599.72. At the time that it took the contract, the Lyman-Richey Sand & Gravel Company planned to haul the sand-gravel by truck from its Brown pit, which was directly west on the same section line and less than five miles in actual distance from this Maple Street job, from which Brown pit over 20,000 tons of gravel was trucked in the year 1931 to road construction jobs in the western part of Douglas county, and which would have required them to have paid 7 cents for transporting each cubic yard of sand-gravel each mile, or 35 cents per cubic yard to truck the same from the Brown pit. No railroad sidetrack was adjacent to the Brown pit, and the material from this, the nearest pit of the Lyman-Richey Sand & Gravel Company, would necessarily have been required to be transported by trucks.

The assistant general freight agent of the Union Pacific testified in the district court that the railroads had lost the greater part of the traffic in this commodity, as well as in live stock, stating that in 1930 and in 1931 90 per cent. of live stock going into South Omaha from a radius of 25 miles moved by truck, and that in March, 1931, the Union Pacific solicited the appellee to allow it to haul the sand-gravel for this Maple Street contract from its pits near Valley, Nebraska, which were upon the Union Pacific tracks at a distance of some 8.3 miles from the Maple Street job, for which haul the rate had been 90 cents per cubic yard, a cubic yard weighing about 3,000 pounds. The appellee company agreed to give this business to the Union Pacific if it could be hauled at the rate of $25 per 60-ton car, and thereupon the first emergency rate, to expire May 31, 1931, was put in by the Union Pacific to secure the hauling of sand-gravel for this particular job, and in the application to the state railway commission, of April 1, 1931, as set out in exhibit 3, the Union Pacific stated that they were publishing this emergency rate "only for the purpose of meeting truck competition there present." That the executive vice-president of the Burlington, Mr. Spens, asked Mr. George P. Abel, of the Abel Construction Company, to come to Chicago to tell them how the railroads

could obtain some of the gravel business, and after that conference it was decided that the Burlington would also install similar emergency rates between certain points, and the testimony discloses that Mr. Abel switched six or seven projects from truck to railroad haul under the emergency rates, but he testifies that no contractor gained anything by the change, for the railroads dropped their rates only just enough to meet the truck rates. Thereafter such emergency rates were extended to some 200 stations in Nebraska by the different railroads.

The appellant claims there were no established freight rates for shipping sand-gravel by trucks. The appellee denies this, and insists that practically all sand-gravel required for highway construction projects within ten miles of the Platte river during 1930 had been hauled by trucks, and that while the rates varied slightly, depending upon the length of the haul and the kind of roads over which it was to be transported, yet truck rates on sand-gravel had finally reached an average freight rate of 7 cents per cubic yard per mile upon all of such projects, and that this was well known to the highway department of the state.

It is conceded by all parties that the emergency railroad rate in this case, of $25 per 60-ton car, was still higher than the appellee could have had the sand-gravel hauled by truck from its Brown pit, but that there was a slight advantage in loading it at the Valley pits into railroad cars over loading it into trucks at the Brown pit, but that in dollars and cents it cost the appellee more to transport this sand-gravel to the Maple Street job by rail than it would have cost it to have transported it from the Brown pit by truck. The total shipment was 15,447 tons in 265 railroad cars.

The rail rate in force for the 8.2-mile haul from the Valley pit was, at the time of signing the contract, 60 cents per ton, or 90 cents per cubic yard, while the rate by truck for the five miles from the Brown pit was 35 cents per yard and 10 cents per yard for piling it in a stock pile, a total of 45 cents, or just one-half the rail rate then in force. The

emergency rail rate, of $25 per 60-ton car, was about 41 cents per ton, or 60 cents per yard.

■ The first proposition of law involved in the case is whether the term "freight rates," in the paragraph of the contract cited above, means only railroad freight rates, as contended for by the state, or freight rates generally of any carrier. The new Oxford dictionary, among the definitions for freight, says, goods in transit, the cargo, anything carried by sea or land. If the word "freight" covers commodities generally, why may not the term freight rate cover the cost of carriage by whatever means? The word "freight" has been used from the earliest times to mean the property or commodity which is carried, whether it was that which was carried in times past in Conestoga wagons drawn by ox teams across the plains, or whether it was carried upon canal boats, or is carried today by aeroplane, or by truck, as well as by rail. Quotations are given in appellee's brief from the Nebraska City News of November 28, 1860, showing the extensive freighting business of Alexander Major, who transported nearly three million pounds of freight that season across the plains, using 515 wagons and 5,687 oxen.

The legislature of Nebraska, in adopting section 20-406, Comp. St. 1929, recognized the increasing use of trucks in transportation of commodities, and provided that summons might be served upon trucking companies engaged in the business of common carriers, and the legislature of 1931, in chapter 107, mentioned "freight-carrying vehicles," covering a truck or a trailer used for freight. The first of these sections was held valid in *Schwarting v. Ogram, ante,* p. 76.

With the present network of lines of trucking companies running upon regular routes over practically the whole United States, it would seem to this court that the term "freight rates" would apply to and mean the compensation to be paid for conveying commodities by truck as well as by barge, aeroplane, or rail.

■ In construing the paragraph of the contract in dispute in this case, the judge must endeavor to place himself in the position of the parties, then to ascertain the intention of the parties and the object and purpose designed to be accomplished by the provision in dispute. Was it the intention of the parties that this section of the contract should be rigidly enforced, even when the contractor lost money by using an emergency reduced rate for shipment by rail, or was it not rather the purpose of this section of the contract to require the construction company to pay to the state any extra profit secured by an unexpected reduction in the haulage price after the contract had been signed up? *Nebraska Hardware Co. v. Humphrey Hardware Co.*, 81 Neb. 693. See 4 Neb. Law Bulletin, 215, 228.

■ ■ It may be accepted as a universal rule that a contract upon a printed form prepared by and regularly used by the state for such highway contracts and containing a printed condition of doubtful meaning, such disputed provision should be construed more strictly against the party who prepares and furnishes such form of contract than against the other party.

"In construing a contract, if the language of the contract does not clearly express the intention of the parties, the character of the subject-matter and the circumstances surrounding the transaction must be considered in determining their intention." *Hardy v. Ward*, 64 S. E. 171 (150 N. Car. 385) ; *Farmers Nat. Bank v. Delaware Ins. Co.*, 83 Ohio St. 309. In a contract prepared by one of the parties, language susceptible of more than one construction may be given such construction as the other party would be fairly justified in giving to it. *Flory v. Supreme Tribe of Ben Hur*, 98 Neb. 160.

■ The legislature has provided a rule to guide the courts in determining appeals of this nature. Section 27-322, Comp. St. 1929, provides that the courts shall hear and determine such matters according to justice and right, as upon the amicable settlement of a controversy, and shall render judgment against the state or the claimant as right

and justice may require. This can mean that the broadest equitable principles shall be applied and the decision pronounced shall be the result of applying as liberal rules as laymen apply in an amicable settlement of a dispute between them. · After such a consideration of the case, we do not believe this provision was ever intended to force a highway contractor to suffer a loss by forfeiting to the state a sum of money under the conditions set out in the facts of this case. The emergency rates by rail from the Valley pit were still higher than the truck rates from the Brown pit, therefore the cost was not reduced to the contractor because he shipped by the emergency rail rate.

The state asks for a reversal because the term "freight" rates in the paragraph of the contract under discussion applies to and means only *rail* freight rates. The state further urges that the question whether the contractor intended to ship by truck if emergency rail rates had not been adopted to meet truck competition cannot be considered by the court in deciding the question at issue. The state finally insists that the facts as to whether the use of the emergency rail rates caused the contractor to gain an unlooked-for profit, or resulted in a loss, are entirely immaterial in this cause.

We have examined the state's brief with care on these points and we cannot bring ourselves to adopt a position which will operate oppressively in favor of the state and compel the payment to the state of money which we believe the state is not entitled to under the terms of the contract.

In our opinion, the clause in controversy in the contract would not apply unless there was an actual saving or an actual loss to the contractor by a change in the freight rates. The purpose of this clause was to do equity between the state and the contractor and force the contractor to forfeit to the state any unexpected gains he made by reason of an unforeseen lowering of freight rates, or, on the other hand, to require the state to add to the price of the contract any actual loss sustained by the contractor by reason of a raising of freight rates beyond what was

within the contemplation of the parties at the time the contract was signed.

After a careful consideration of the transcript, bill of exceptions and briefs filed, we find no error in the record, and the judgment of the district court is hereby

AFFIRMED.