**City of Chicago, Appellee, v. Iroquois Steel and Iron Company, Appellant.**

**Gen. No. 38,610.**

Opinion filed April 7, 1936.

LEE D. MATHIAS, of Chicago, for appellant.

WILLIAM H. SEXTON, Corporation Counsel, and MICHAEL L. ROSINIA, Prosecuting Attorney, for appellee; MARTIN H. FOSS, Assistant Corporation Counsel, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Defendant, a dealer in scrap iron and steel, was found guilty and fined $100 in the municipal court of Chicago upon a charge of conducting the business of a wholesale junk dealer without having first procured a license under section 3705 of the municipal code. Defendant prosecuted an appeal to the Supreme Court on a certificate by the trial judge that the validity of a municipal ordinance was involved. The Supreme Court stated, however, that "the appeal involved the construction of the ordinance as to whether it is applicable to appellant's particular business rather than as to its validity" (*City of Chicago v. Iroquois Steel & Iron Co.*, 361 Ill. 330) and transferred the cause to this court for determination.

The complaint filed in the municipal court charges defendant with conducting, operating and carrying on the business of a wholesale junk dealer on the premises known as 4634 Roosevelt road, Chicago, without having first obtained a license to do so, in violation of sec. 3705 of the municipal code. To sustain this charge the city called as a witness one Thomas Walsh, a license investigator, who testified that he visited defendant's premises on May 21, 1934, and there saw some cars loaded with scrap iron and steel and also several carloads of iron and steel, unloaded; that the men were putting the scrap iron and steel in a baling machine and making bundles of it; that defendant's place of business is located on a lot with a frontage of about 100 or 150 feet, and a depth of 300 feet or more, with a switch track in the yard and a large

derrick located therein; that he met a man there who seemed to be in charge of the office, and asked him whether they had a junk license and that the man told him that their lawyer said they did not need a junk license to run their business, because they were not in the junk business; that they were handling only old iron, grading and sorting it, and buying and selling it in large quantities. On cross-examination, Walsh testified that he did not see any loose or baled rags or loose or baled waste paper or other paper or bottles or any old rubber on the premises, and that he did not see any wagons or junk peddlers in the yard and did not know how defendant transacted its business, to whom it sold or from whom it bought.

Benjamin J. Tansey, another witness called on behalf of the city, testified that as a building inspector he had examined the records of the building department but could find no application for junk license made for or on behalf of defendant, at any time.

At the conclusion of this evidence defendant moved the court to find in its favor. The motion was overruled, and thereupon defendant called Samuel Gordon as its witness. He testified that he had been defendant's employee for about 10 years, as assistant office manager, and was familiar with all its business; that its premises had a frontage of 150 feet on Roosevelt road, with a depth of more than 300 feet; that on it is situated a railroad siding, or switch track, capable of holding four railroad cars which can be loaded or unloaded at the same time; that the type and character of the business conducted by defendant on the premises is the buying of iron already sorted, and grading and preparing the same for market; that defendant had a "shears" on the premises for cutting up the iron in suitable sizes for various foundries and mills; that defendant's sales were in large quantities only, 500 pounds and over; that it did not handle any

rags, rubber, brass or any other metal aside from iron, nor deal in waste paper, used rubber, bottles or any of the items or articles commonly designated as junk; that defendant dealt only in iron, of various sorts and grades, and steel, exclusively; that it bought iron and steel from junk dealers in carload lots and in large quantities, and was not in the junk business; that it did not buy any merchandise from minors, nor from adults except as heretofore stated, and that it did business with the Chicago Screw Co., who was engaged in manufacturing bolts and screws for automobiles; that defendant is known as a wholesale distributor of scrap iron and that its shipments were as large as fifteen cars at one time. Upon this evidence the court found defendant guilty of violating the city code.

In its brief filed in the Supreme Court defendant makes six points. Under the Supreme Court decision hereinbefore referred to all questions pertaining to the power of the city to enact the ordinance involved, the validity of the ordinance, and the power of the city to tax, license and regulate the character of business in which defendant is employed, are eliminated from consideration, and the principal question that we are called on to determine is whether this ordinance is applicable to defendant's particular business. Defendant relies principally upon *City of Chicago v. Northern Paper Stock Co.*, 337 Ill. 194, for reversal of the judgment. In that case defendant was fined for operating the business of a junk dealer without a license in violation of section 3512 of the municipal code of 1922, as amended. It appears from the opinion that defendant there occupied a three-story building, 80 feet wide by 180 feet long in Chicago, and was engaged in buying sorted rags and paper in bales by loads from dealers in those commodities. It opened the bales, removed foreign substances therefrom, further sorted the rags and paper according to quality, graded them and made them up in new bales and then

sold them to mills in carload lots weighing 15 to 16 tons, save that smaller quantities, not less than 500 pounds, were sold to local mills and delivered by trucks. In discussing the question whether that particular business came within the terms of the regulatory measures of the ordinance, the Supreme Court said (p. 198):

"The question whether a certain business comes within the municipal power to tax, license and regulate, granted by statute, must be determined by the general character and scope of the business. (*Commonwealth v. Farnum,* 114 Mass. 267; *Commonwealth v. Ringold,* 182 id. 308; *Eastman v. City of Chicago,* 79 Ill. 178.) Sub-section 95 of section 1 of Article 5 of the Cities and Villages act designates junk stores and yards as the subjects which, under the grant of power, may be municipally regulated. The business of dealing in junk is a recognized commercial enterprise. In conferring upon cities and villages the power to tax, license and regulate junk stores, the General Assembly doubtless contemplated that the power would be exercised with respect to places of business commonly known and understood as such. The added power enabling a city or village to forbid a junk store buying or receiving any article from a minor without the written consent of his parent or guardian enforces this conclusion. . . .

"Without a statutory grant of power, the commonly accepted meaning of a junk store cannot be extended by ordinance to include the business of buying rags and paper from dealers in large quantities, sorting and grading them according to quality, and selling them to mills and factories, usually in carload lots. In such a business the materials are not collected, held or sold in the manner practiced by one operating a junk store or yard. A business does not come within the terms of a regulatory measure when the reason for the regulation does not exist. (*Com-*

*monwealth v. Ringold, supra;* 2 Words and Phrases, (2d ser.) p. 1273.) The reasons requiring junk stores to obtain licenses do not apply to a business such as is conducted by the appellant, and that business does not come within the grant of power to a city to license junk stores and yards.''

In *West Side Metal Refining Co. v. City of Chicago,* 140 Ill. App. 599, defendant was fined for carrying on the business of a junk dealer without first having obtained a license so to do. The evidence there disclosed that it was engaged as a dealer at wholesale and buying new and old metals in large quantities of not less than 500 pounds up to carload lots; that it refined about one-fourth of all the metal so purchased and sold the same to foundries at wholesale; that it had no dealings with peddlers and did not deal in old bottles, rags or articles of a kindred character. The evidence clearly indicated that its business was that of a wholesale dealer. The court characterized the purpose of the ordinance as follows (p. 602):

''The creating of ordinances such as the one under discussion is an exercise by the city council of the police power, and such ordinances are enacted because of the likelihood, grounded on experience, that junk may have been stolen or pilfered, and for protection against such larcenies, the traffic is regulated by ordinance; and as said in *City of New York v. Vanderwater,* 113 N. Y. App. Div. 456, so we say: 'It seems clear that the general character and scope of the business of the defendant does not fall within the description of a dealer in junk. There is a radical difference between the buyer of great masses of metal weighing tons at a time, . . . and one who may buy old bottles, scraps or pieces of metal, slush, old rope and the like, which might readily be pilfered or stolen and carried away secretly to be sold by the culprit. It is the business of this character which is to be licensed.' ''

The court in *West Side Metal Refining Co. v. City of Chicago, supra,* referred to *City of Chicago v. Reinschreiber,* 121 Ill. App. 114, wherein it was held that one who bought and sold old and new bottles exclusively was not a dealer in junk, and said that if one who deals exclusively in old and new bottles is not a junk dealer, "By what process of reasoning does one who deals in old and new metals, refining one-fourth of such metals, become a junk dealer or the keeper of a junk store?" In the *Reinschreiber* case, *supra,* it was said that the statute authorized the licensing and taxing "of second-hand and junk stores" to "forbid . . . purchasing or receiving from minors without the written consent of their parents or guardians . . . where inducements are liable to be held out to minors to steal material in order to sell it at such stores," and a junk store was defined in that case to be "a place where 'junk' is dealt in," and junk was defined as "worn out and discarded material in general that may be turned to some use; especially old rope, chain, iron, copper, parts of machinery, and bottles gathered or bought up by tradesmen called junk dealers; hence, rubbish of any kind, odds and ends." The court concluded that defendant's business could not be properly described as that of a junk dealer, and said (p. 118):

"He buys old bottles, to be sure, as well as new, but he deals in nothing else. He is not a buyer or seller of old and worn-out or miscellaneous materials."

In *City of Chicago v. Lowenthal,* 146 Ill. App. 570, affirmed in 242 Ill. 404, the city brought action for an alleged violation of the junk shop ordinance. Defendant was a large dealer, principally in car lot quantities, in old and new metals, rubber and rags at wholesale. He did not procure a license to keep a junk shop, because he claimed not to be, in the language of the ordinance, "exercising, carrying on, or engaging in the business of keeping a junk shop, or what is commonly

called a junk shop." In discussing whether or not defendant came within the ordinance, the Appellate Court said (p. 571):

"The court below agreed with him, and so do we. The case is not distinguishable from *West Side Metal Refining Co. v. City of Chicago,* 140 Ill. App. 599. We are of the same opinion as when that case was decided."

The city argues that there is need for supervision by the public authorities of establishments such as defendant's, in order to cope with the enormous present day traffic in stolen automobiles and accessories, and also because of the nuisance factor present in large establishments where much noise is made by the knocking to pieces of old automobiles and where auto parts are piled up in high stacks in yards, furnishing fire hazards. We quite agree that there is need for supervision by the public authorities of junk shops and junk dealers within the meaning of the statute, but the evidence in this case discloses that defendant was not in the junk business within the commonly accepted definition of that term, as laid down by the foregoing authorities. It purchased iron and steel from dealers in carload lots and in large quantities only. It did not buy from minors, nor from adults except in large quantities, and was apparently carrying on a legitimate wholesale business in sorted iron scraps. It did not deal in rags, rubbish, brass or other metals, aside from iron, or of material of a miscellaneous character. Nor is the argument convincing that defendant's business required supervision because of fire hazards. We think this proposition is refuted by the mere statement thereof.

After a careful consideration of the authorities cited by both parties, we are of the opinion that the *Northern Paper Stock Co.* case, *supra,* is precisely in point and controlling. The only difference between the two

cases is that in the case at bar the material handled was scrap iron and steel, whereas in the other case defendants were dealers in assorted rags and paper. In both cases sales were made to mills in carload lots or other large quantities, and purchases were made in the same manner. According to the evidence in the instant case defendant did not purchase from junk gatherers; it dealt in iron of various sorts and grades, and steel, exclusively, and bought from junk dealers in carload lots and in large quantities only. If the ordinance in the *Northern Paper Stock Co.* case, *supra,* was not applicable to that defendant's particular business, it would logically follow that the ordinance is not applicable to defendant's business in this proceeding, because the business of both defendants was similar with reference to the manner in which they purchased and disposed of the merchandise in which they were dealing. Scraps of new iron and steel left from manufacturing processes, and iron and steel recovered from buildings being wrecked and from parts of automobiles cut to sizes to meet the specifications of steel mills and foundries, are not junk within the provisions of the ordinance and under the decisions cited.

For the reasons stated we think the judgment of the municipal court should be reversed and it is so ordered.

*Reversed.*

SCANLAN, P. J., and SULLIVAN, J., concur.