GEORGE E. GALLAGHER ET AL., APPELLEES, v. EVERETT L. VOGEL, APPELLANT, IMPLEADED WITH RUBY G. VOGEL, APPELLEE.

61 N. W. 2d 245

Filed November 27, 1953. No. 33380.

*John A. Wagoner,* for appellant.

672

*Higgins & Higgins,* for appellees.

Heard before Simmons, C. J., Messmore, Yeager, Chappell, Wenke, and Boslaugh, JJ.

Messmore, J.

The plaintiffs, George E. Gallagher and Dorothy M. Gallagher, brought this action in equity in the district court for Hall County against Everett L. Vogel and Ruby G. Vogel, defendants, the purpose of the action being to recover damages in the amount of $7,800 for a breach of a written contract entered into by and between the plaintiff George E. Gallagher and the defendant Everett L. Vogel, and to enjoin Everett L. Vogel from engaging in the junk business in violation of the agreement. The case proceeded to trial as between George E. Gallagher and Everett L. Vogel as being the proper parties in interest. The trial court rendered judgment against the defendant in the amount of $2,160, and enjoined the defendant from selling or otherwise disposing of usable parts from dissembled cars, and from owning and operating a junk business in violation of the agreement. The defendant filed a motion for new trial. Thereafter, the trial court modified the judgment by reducing the amount and granting the plaintiff a recovery of $1,350 instead of $2,160, and overruled the defendant's motion for new trial. From this order the defendant appeals to this court.

For convenience we will refer to the parties George E. Gallagher as plaintiff and Everett L. Vogel as defendant.

The record discloses that the plaintiff had engaged in farming, and had some experience in the junk business. On or about November 1, 1949, he became interested in purchasing the defendant's business. The defendant had been engaged in the junk business since 1933, and carried on his business at the west edge of Wood River. He had been, and was, engaged in the used-car business at the time that the plaintiff entered into a written

contract with the defendant on November 25, 1949. The terms of the agreement were to the effect that the plaintiff purchased from the defendant and his wife Ruby G. Vogel, 6½ lots in Wood River, Nebraska, and in addition, the building on said lots, tools, equipment, and stock of merchandise, junk and things pertaining to the junk business. The consideration was $6,000, $2,000 of which was paid in cash and the balance of $4,000 was due and payable when the abstract of title was delivered with the deed, clear of encumbrance. The agreement further provided: "Its (sic) further agreed by and between above named parties, that party of the first part (the defendant) will not start, own or operate a junk yard within 15 miles of Wood River, Nebraska."

The plaintiff took possession of the business on November 25, 1949. The deed was dated December 22, 1949, and was recorded February 20, 1950. The deed was placed in escrow until the purchase price was paid and eventually delivered to the plaintiff in April or May 1951.

The plaintiff testified that the reason the covenant was put in the contract to purchase was to eliminate competition from this type of business and to enable him to make a living in conducting the business.

About 3 weeks after the time the plaintiff took possession of the business, the defendant resumed the junk business on the east edge of Wood River in the Kinneman building. There was no sign over the building to show the business in which the defendant was engaged. About 4 weeks after the date of taking possession of the business, the plaintiff contacted the defendant and asked him what he was going to do about the contract. The defendant informed him that he was going to find another location in a different town. At that time the plaintiff inspected the defendant's yard and noticed several used cars in the back thereof which were partially torn down, and a truck on the inside of the building which was

also partially torn down. These cars had no license plates on them. The defendant also had on hand a stock of starters, generators, tires, and batteries, and was transacting the same kind of business as the plaintiff. About 4 months later, the plaintiff again went to the defendant's place of business. The defendant was still wrecking cars, and had four or five on hand. The defendant was conducting the same type of business in which the plaintiff was engaged. The defendant again told the plaintiff that he was looking for a location in another town to start a business. On May 24, 1951, the defendant purchased a building in Wood River, moved into it, and conducted the same type of business as he had formerly conducted. The plaintiff visited the defendant's place of business and noticed the defendant was still wrecking cars and had a number of wrecked cars on hand, and a display of merchandise for sale of the same kind as the plaintiff sold. Again on February 1, 1952, the plaintiff looked over the defendant's place of business and saw a number of cars in the yard. Another person who accompanied the plaintiff took pictures of these cars. These pictures are in evidence for the purpose of showing that some of the cars had been torn down, were being dissembled, and parts taken therefrom. These cars were for the most part just junk. After this action was started, the plaintiff visited the defendant's place of business and noted that all of the cars which were shown in the pictures were gone, and the defendant had cleaned up his yard. The plaintiff went over to the defendant's place of business after it had been cleaned up, and at that time he saw displayed the front and rear ends and wheels of cars, and some used iron.

The plaintiff's books were received in evidence, showing his sales and purchases during the period of time the defendant is alleged to have engaged in the same type of business as the plaintiff in violation of the agreement, and until the defendant had ceased to carry on

such business, which constituted a period of 27 or 28 months. The plaintiff testified that his margin of profit was 50 percent. He estimated his loss during this period to be $200 a month. He was assisted in determining this figure by his counsel, and in making his computation he used the months the defendant was in competition with him and also the months he was not in competition with him. He made a comparison of the business accordingly.

The assessment records of the defendant for the years of 1950 and 1951, disclose certain cars, some of which were of the value of $30 and less, and some $40, one at $100, one at $590, and one at $240. This was for the purpose of showing that cars that were taken in by the defendant were in fact cars ready to be junked. Also, the purchases and expenditures of the defendant for the same period of time were shown in evidence.

On cross-examination the plaintiff testified that at the time he purchased the business, there was no inventory taken; that the value of the iron and old cars which were referred to as "clunkers" or "junkers" was $2,000; that he also purchased used cars and sold them; that he kept a stock of merchandise on hand for the purpose of repairing cars, as well as for sales; that he understood the used-car business went along with the junk yard when he bought the business; and that when the plaintiff purchased the business nothing was said about the used-car dealer's license. The plaintiff obtained a used-car dealer's license in 1950. The plaintiff further testified that he does not junk all of the cars he purchases, and the certificates of title on the cars he does junk are sent to the Department of Motor Vehicles in Lincoln for cancellation. He further testified that the procedure in junking a car is to tear the body and the wheels off, cut up the frame, use the parts that are good for resale, and throw the rest into an iron pile.

The defendant testified that when he sold the business to the plaintiff, he was the owner of a used-car dealer's

license which was known to the plaintiff, and it was understood that the used-car dealer's license would not be transferred. After selling the business, the defendant purchased used cars at various places and repaired them. He kept a stock of parts on hand for such purpose, and to sell. He transferred the certificate of title to the purchaser, and did not send it in to the proper authorities for cancellation. He further testified that he did not junk a car after November 24, 1949; that he did take parts off of used cars, such as tires, generators, and batteries, and resold the usable parts; that he was also engaged in the selling of second-hand furniture; and that all of the merchandise that he purchases is of a usable nature, some of which requires repairs, and this he does. He further testified that 60 percent of his business consists of sales of used cars, 11 percent sales of tires and tubes, 18 percent sales of used furniture, and 6 percent sales of truck and automobile accessories, new and used. He buys and keeps in stock accessories such as bearings, coils, and headlight bulbs. He is not a junk collector, and does not deal in junk. His version of the junk business is, as testified to by him: "I would take and buy cars and tear them down and throw some iron in this pile and sold (sic) it out and sell a few parts; buy radiators, batteries, old tires, magnetoes and anything that says (sic) junk. Junk means stuff of that sort." He bought all kinds of machinery, farm machinery and tractors, assembled them, saved some parts, and when he accumulated a carload, he would ship it.

With reference to the cars in the pictures in evidence, the defendant testified that he sold 15 of such cars to a Mr. Perkins. Six or seven of this number would run. The defendant had taken a few parts off of some of the cars to be used on other cars. He delivered the title to these cars to Perkins, and permitted Perkins to tear up the cars on defendant's premises, which took about a month or so.

Perkins testified that he was in the junk business;

that he purchased 12 or 14 cars and a truck from the defendant in January 1952, and was permitted to cut the cars up on the defendant's premises; and that the titles of these cars were transferred to him by the defendant. Some parts of the cars were missing. He took the cars away in February 1952. He was unable to do so prior to that time on account of weather conditions.

A witness engaged in the used car business testified as to the nature of such a business as follows: A used-car dealer has a repair shop where he repairs used cars for resale. Some of the parts used in repairing cars are new, and some are old. The used parts come from a salvage yard and are taken off of used cars. The used-car dealer keeps a stock of parts on hand, which are very rarely sold to customers, but on occasions a sale is made. A used-car dealer usually takes a trade-in of an older car. When he gets possession of a car which cannot be sold as a running vehicle, the car is sold to a junk yard. The owner of the junk yard requires the title, and gets the title.

In determining this appeal, the following rule is applicable: An equitable action is tried de novo in this court. § 25-1925, R. R. S. 1943. Therein we will reach an independent conclusion without referring to the findings of the district court. However, when the evidence therein on material questions of fact is in irreconcilable conflict this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite. See, Byram v. Thompson, 154 Neb. 756, 49 N. W. 2d 628. See, also, Hall v. Modern Woodmen of America, 153 Neb. 600, 45 N. W. 2d 630; Wiskocil v. Kliment, 155 Neb. 103, 50 N. W. 2d 786.

With reference to the manner in which a written contract should be interpreted, the following is applicable:

Contracts must receive a reasonable construction, so as to give effect to the intention of the parties thereto

and carry out, rather than defeat, the purpose for which they were executed. See Morse v. General American Life Ins. Co., 130 Neb. 37, 263 N. W. 676.

"Language used in a contract prepared by one of the parties thereto, which is susceptible to more than one construction, should receive such a construction as the party preparing the same at the time supposed the other party would give to it, or such a construction as the other party would be fairly justified in giving to it." Flory v. Supreme Tribe of Ben Hur, 98 Neb. 160, 152 N. W. 295. See, also, Lyman-Richey Sand & Gravel Co. v. State, 123 Neb. 674, 243 N. W. 891, 83 A. L. R. 1301.

The intention of the parties governs the meaning of the words employed. A prospective rather than a retrospective meaning is favored, and the context determines whether a word is used in its broad or restricted sense. See, 17 C. J. S., Contracts, § 300, p. 717, § 295, p. 689; Clough v. Standard Oil Co., 130 Neb. 136, 264 N. W. 170.

In consideration of the foregoing authorities, it is the duty of this court to review the evidence to determine the nature of the business carried on by the defendant at the time the contract was entered into, how the parties regarded the business, and the intention of the parties with respect to the business when the contract was entered into.

Much discussion appears in the brief of the defendant to the effect that there is a distinction between the business of a used-car dealer and that of a junk dealer; that it was never the intention of the defendant to dispense with his used-car business; and that the decision in the instant case depends upon the definition of the term "junk."

"Junk" has been defined in various ways. The common and usual definition of the word "junk" is as follows: "Worn out and discarded material in general that may be turned to some use; especially old rope, chain, iron, copper, parts of machinery and bottles gathered or bought up by tradesmen called junk dealers; * * *." Black's Law

Dictionary (4th ed.), p. 988. See, also, 23 Words and Phrases (Perm. ed.), pp. 349, 350, 351; Melnick v. City of Atlanta, 147 Ga. 525, 94 S. E. 1015; City of Chicago v. Iroquois Steel & Iron Co., 284 Ill. App. 561, 1 N. E. 2d 241.

"Junk" has been defined as articles that have outlived their usefulness in their original form, and are commonly gathered up and sold, to be converted into another product, either of the same or a different kind. See, City of Watseka v. Blatt, 320 Ill. App. 191, 50 N. E. 2d 589.

A junk shop is a place or shop where odds and ends are purchased and sold. See, City Council of Charleston v. Goldsmith (S. C.), 12 Rich. Law 470; Grace Iron & Steel Corp. v. Ackerman, 123 N. J. L. 54, 7 A. 2d 820.

We conclude that at the time the contract was entered into between the parties, the intention of the parties was to consider the business as it was at that time conducted and recognized as a junk business by the defendant and the plaintiff.

In cases such as the instant case, damages are rarely susceptible of accurate proof; but the measure of damages, expressed generally, is the value of the business lost to the plaintiff—not the gain of defendant, which may be more or less than plaintiff's loss; though such gain may be considered in evidence, it should be shown to correspond in whole or in part with the loss of plaintiff. See, Gregory v. Spieker, 110 Cal. 150, 42 P. 576, 52 Am. S. R. 70.

While the measure of damages in an action for the breach of an agreement by the seller not to re-enter business in competition with the buyer is usually difficult of exact computation, he who is damaged will not be precluded from recovering because of that fact. But the plaintiff will be called upon, in order to recover substantial damages, to furnish sufficient data to enable the court, with a reasonable degree of certainty and exactness, to estimate the actual damages, and if he fails to do this he can recover only a nominal sum. See,

Scotton v. Wright, 32 Del. 192, 121 A. 180; Salinger v. Salinger, 69 N. H. 589, 45 A. 558.

The most that can be done is to adduce the pertinent facts and submit them to the trial court to estimate and determine the sum which will afford the injured party reasonable compensation. See Galucha v. Naso, 147 Iowa 309, 126 N. W. 146.

Speaking broadly, the amount recoverable for breach of an agreement by the seller of a business not to engage in competition with the buyer is the loss which the latter has sustained, naturally resulting from the breach.

The general rule is that the party injured by a breach of contract is entitled to recover all of his damages, including gains prevented, as well as losses sustained, provided they are certain and such as might naturally be expected to follow the breach. See Western Union Tel. Co. v. Wilhelm, 48 Neb. 910, 67 N. W. 870.

The measure of damages in the case of a breach of contract is the amount which will compensate the injured party for the loss which a fulfillment of the contract would have prevented or the breach of it has entailed. See, Elvidge v. Brant, 131 Neb. 1, 267 N. W. 169; Western Union Tel. Co. v. Wilhelm, supra; Diels v. Kennedy, 88 Neb. 777, 130 N. W. 740; Schrandt v. Young, 2 Neb. Unof. 546, 89 N. W. 607; Merager v. Turnbull, 2 Wash. 2d 711, 99 P. 2d 434, 127 A. L. R. 1142; Annotation, 127 A. L. R. 1156.

This court has said that partial restraints upon the exercise of any business are not unreasonable when they are ancillary to a valid contract affecting the business of the party in whose favor they are imposed, if made in good faith and are apparently necessary to afford reasonable protection to such party. See, Swingle & Co. v. Reynolds, 140 Neb. 693, 1 N. W. 2d 307; Stanford Motor Co. v. Westman, 151 Neb. 850, 39 N. W. 2d 841; Wittenberg v. Mollyneaux, 60 Neb. 583, 83 N. W. 842.

From an examination of the record and the authorities

heretofore set out, we conclude the judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.

CARTER, J., participating on briefs.