77 So.2d 354

**CITY OF BIRMINGHAM**

v.

**HOFFMAN & ROBINSON et al.**

**6 Div. 821.**

Supreme Court of Alabama.

Jan. 13, 1955.

J. M. Breckenridge, Birmingham, for appellant.

John D. Hill, Frank Bainbridge, Bainbridge & Mims, Birmingham, for appellees.

PER CURIAM.

This is an appeal from the final decree of the circuit court, in equity, in favor of respondents in a suit by the City of Birmingham. It is controlled by the question of whether respondents were liable to the city for the amount of a certain license charge claimed by the city for several years on account of the line of business in which respondents were engaged. The trial was had on evidence taken orally before the judge who rendered the decree.

The city is claiming that respondents have engaged in conducting a "junk yard" or "junk business", and are subject to a license fee fixed by a schedule of the city license code applicable and effective during the years in question. Respondents claim they were not engaged in that sort of business, but in the business of scrap iron brokerage, for which they paid the city an annual license charge for the years in question extending from 1948 to 1952, inclusive.

The provision of the city license code on which the city rests its claim is in the following language:

"Junk Yards—Each person, firm or corporation conducting a junk yard and/or junk business, including second-hand machinery, shall pay a license of $240.00 on the first $100,000, or less, of gross receipts from said business for the next preceding year, plus an amount equal to 3/40ths of one per cent on all receipts from said business in excess of $100,000 for the year next preceding."

The amount of the charge, if there is liability, is not contested at this time.

During each of the years above mentioned there also appears in the city license code the following:

"Junk Dealers—Buying or selling bottles, cans, barrels, or boxes, each person, firm or corporation (where more than $100.00 stock is carried at any one time)—$120.00".

Section 711 of the General City Code of Birmingham contains a definition of "junk", as follows:

"The word 'junk' wherever used in this chapter, shall mean and include any part of a railroad car or any part of a street car or a steam locomotive, any railroad equipment, plumbing fixtures or part thereof, any part of an automobile or a motorcycle, any gas or electric chandeliers or parts thereof, any brass, copper, household hardware, railroad journals, air-brake hose, knuckle pins, railroad brasses, copper wire, copper cable wire, sewer manhole covers, storm-waste inlet covers, any gold, silver, jewelry or other articles containing gold or silver."

Section 731 of the Birmingham General City Code provides that:

"No person shall engage in the business of a junk dealer, junk buyer, or junk peddler in the city without a license therefor and without complying with the provisions of this chapter".

Section 734 of that code requires the payment of a license tax "in the amount specified in the current license code". The then current license code (1944), when the general code was adopted and in effect for each of the years in question, contains the same provisions for junk dealers copied above.

The evidence shows that the partnership was formed in 1945. They had a place of business in north Birmingham which consisted of a small two room office fronting on the street. Back of that there was a structural building roughly eighty-five by one hundred feet, with a concrete floor, adjoining a vacant building about seventy-five feet wide and one hundred feet deep. They did not sell or purchase in their place of business in Birmingham, rags, old rope, paper, bagging, slash, cordage, rubbish, glass, barrels, boxes, bath tubs, plumbing fixtures, chandeliers, bicycles, secondhand

machinery, articles containing gold, silver jewelry, secondhand brass electric or gas fixtures, brass or lead plumbing fixtures, railroad journals, parts of railroad cars or street cars, parts of automobiles or motorcycles, household hardware, air brake hose, knuckle pins, sewer manhole covers, storm water inlet covers, rubber, automobile hubcaps, wheels, tires or parts, or any junk or material of any kind from peddlers. Nor did they buy junk or material from junk gatherers, including minors and colored people. That they did not buy or sell materials at their place of operation from those who usually collect and peddle it, or from anyone else. They process no material and have no appliances or tools for doing so, and do not recondition any of it. There was evidence that, in the main, they purchase for some one of their principals from dealers in carload lots and in large quantities which they never handle, but they have bought in smaller quantities from local plants. Those plants sometimes have a small accumulation of what they term miscellaneous compressed scrap. They cannot load it into cars because it would be refused by the mills, so the plants ask respondents to come out there and haul it from their premises, which they do. The amount would be anywhere from one, two or three tons of compressed scrap, and that constituted eight to ten per cent of their business. They would take it to licensed dealers in town, but would not keep it in their warehouse. The only scrap they kept in the warehouse was nonferrous brass, copper and aluminum.

They are known in the trade as scrap brokers. Except as noted above, the material is shipped direct from the seller to the consuming market. They collect a brokerage on the transactions. The orders come from steel plants or foundries. A list of people for whom the respondents bought scrap metal was furnished, consisting of forty or more such industrial operators, some in Birmingham and many in foreign states. They include smelting operators and other large industries. Plants of that kind always required during any thirty day period certain tonnage of scrap steel, iron or metal for production. They would tell respondents what tonnage of scrap they desired respondents to secure for them for a given thirty day period, and respondents would locate the scrap for sale by the different licensed scrap dealers, or different railroads, or industrial plants and then advise such mill that they had located the tonnage. The price would be given respondents by the mill and respondents would advise the supplier the price the mill was willing to pay and ascertain if the price was satisfactory. If so, respondents would notify the supplier when to ship the given load of a certain kind to the consuming mill. Respondents charged a brokerage of one dollar per ton. This was permitted by O.P.S. and O.P.A. while they operated. The price on the scrap was fixed by the government. The average order was roughly around five hundred tons, requiring ten to twelve cars. The largest order was three thousand tons, or about sixty carloads. When one of the suppliers shipped a car of scrap to the mill that scrap must be acceptable to the mill. After it has been received, if satisfactory, the supplier rendered respondents an invoice at the suppliers' price. They then invoiced the mill at the suppliers' price plus an agreed commission, consolidating the two charges in one statement to the mill. The mill would then issue to respondents one check including the suppliers' price plus an agreed commission. There was no bill of sale to respondents. Their invoice forms describe respondents as "brokers". The suppliers billed the material to respondents as purchasers, and respondents billed the material as a sale to the consumer with their commission added, as stated above. They always refused to buy wagon or truck loads of scrap. A large part of the scrap was from iron or steel left from manufacturing processes or waste metals.

The income tax returns of respondents listed as receipts the amount paid them by the consumer mills, to whom the scrap was shipped, and the amounts paid by respondents to the suppliers were deducted in determining the net income of the business.

During the years in question respondents have paid the city on demand a license tax imposed on their business by the city officers after inspecting it. That is material

in an effort to classify respondents' business for license purposes. We note that respondents do not seem to have contended that they are not subject to the brokers' license on account of the interstate nature of much of their business. They do an interstate as well as an intrastate business. State v. W. M. Meador & Co., 240 Ala. 164, 198 So. 166; Id., 29 Ala.App. 450, 198 So. 163; Leibold v. Brown, 260 Ala. 354, 71 So. 2d 7; Graybar Electric Co. v. Curry, 238 Ala. 116, 189 So. 186; Curry v. Feld, 238 Ala. 255, 190 So. 88.

With respect to the application of a city license ordinance this Court in the case of Stratford v. City Council of Montgomery, 110 Ala. 619, 20 So. 127, stated what, we think, is commonly understood to be the elements of a brokerage business.

■ The question we have for consideration calls for a classification of respondents' business only to the extent of finding whether it is in whole or in part that of a "junk yard and/or junk business, including second-hand machinery". If they are exclusively brokers, as defined in the Stratford case, supra, they would not be subject to the license here in question. The invoices indicate a purchase by them of the scrap and a sale of it to their customers. That is not necessarily inconsistent with their testimony that the purchases were made under an agreement *as brokers* for their principal. If they purchased and sold on their own account it would not, to that extent, be a brokerage according to our cases, and they might be subject to a tax for conducting that sort of business. Graybar Electric Co. v. Curry, supra; Curry v. Feld, supra.

The testimony of respondents is clear and specific that during the years in question they transacted their business as brokers, representing the mills to whom they made a charge for the service pursuant to a previous agreement between them.

But as to those transactions which relate to material bought locally, none of which was unloaded in their yard except non-ferrous scrap, although they were purchases and sales on their own account, respondents were not by reason thereof engaged in conducting a junk yard or junk business. Appellees have furnished an impressive array of authorities which fully sustain that theory. We cite them: West Side Metal Refining Co. v. City of Chicago, 140 Ill.App. 599; Commonwealth v. Ringold, 182 Mass. 308, 65 N.E. 374; City of Chicago v. Lowenthal, 242 Ill. 404, 90 N.E. 287; City of Chicago v. Northern Paper Stock Co., 337 Ill. 194, 168 N.E. 884; City of Chicago v. Iroquois Steel & Iron Co., 284 Ill.App. 561, 1 N.E.2d 241; City of New York v. Vandewater, 113 App.Div. 456, 99 N.Y.S. 306; Eastern Scrap & Salvage Corp. v. Burns, 5 N.J.Super. 616, 68 A.2d 663.

■ A licensee may engage in two or more enterprises and each be separately taxed. City of Mobile v. Richards, 98 Ala. 594, 12 So. 793; City of Mobile v. Craft, 94 Ala. 156, 10 So. 534; Board of Revenue of Montgomery County v. Montgomery Gaslight Co., 64 Ala. 269; Hill Grocery Co. v. State, 26 Ala.App. 302, 159 So. 269. But he should not be taxed on two different classifications for doing one sort of business. Hill Grocery Co. v. State, supra. The case of Burnette v. State, 28 Ala.App. 110, 181 So. 299, certiorari denied 236 Ala. 114, 181 So. 301, and other cases cited by appellant contain nothing which reflect upon the principles stated above.

■ In our opinion the trial judge was justified in reaching the conclusion from the evidence of the witnesses before him that respondents were not for the years in question engaged in conducting a junk yard business as expressed in the city ordinance set out above.

The decree should be affirmed.

The foregoing opinion was prepared by Foster, Supernumerary Justice of this Court, while serving on it at the request of the Chief Justice under authority of Title 13, section 32, Code, and was adopted by the Court as its opinion.

Affirmed.

LIVINGSTON, C. J., and LAWSON, STAKELY and MERRILL, JJ., concur.