GRACE IRON & STEEL CORP., A BODY CORPORATE OF THE STATE OF NEW YORK, PROSECUTOR, v. FRANK I. ACKERMAN, BUILDING SUPERVISOR OF THE CITY OF PASSAIC, THE BOARD OF ADJUSTMENT OF THE CITY OF PASSAIC, AND THE CITY OF PASSAIC, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.

Submitted June 27, 1939—Decided July 27, 1939.

Before Justice HEHER, pursuant to *R. S.* 1937, 2 :81-5.

For the prosecutor, *Samuel Saffron* (*Saul Nemser,* of counsel).

For the defendant, *Joseph J. Weinberger.*

HEHER, J.  The question at issue here is the propriety of municipal action denying prosecutor's application "for permission to occupy or use" a tract of land possessed by it as lessee (there were no buildings thereon except a small "telephone shack") abutting two hundred and eighteen feet on the westerly side of the Passaic river, a navigable stream, for the "loading" of scrap iron & steel on scows & storage."

The application was made on December 20th, 1938, to the supervisor of buildings of the City of Passaic, wherein the lands are situate.  It met with immediate rejection by that officer on the ground that the "property is in the Industrial Zone, and the Zoning Ordinance, under section 16 and the amendments passed in 1935, does not permit a business of

this type which is classified as a Junk Yard." Thereupon, prosecutor appealed to the Board of Adjustment of the municipality; and that body, at a meeting held on March 27th, 1938, "voted to uphold" the supervisor's "refusal to grant a permit" to prosecutor "to use dock space" on the premises "as a terminal for storage and loading iron and steel." This writ of *certiorari* was then sued out; and the entire proceedings have been returned in accordance with its mandate.

The local zoning ordinance was adopted on June 20th, 1922. It provided for the continuance of existing non-conforming uses, and for the issuance of certificates of occupancy by the building supervisor. On April 2d, 1935, a supplement to the ordinance was adopted prohibiting the operation of "Junk Yards" within the industrial districts delimited by the ordinance; and the initial and determinative point of inquiry is whether the use thus sought to be made of the premises falls within the prohibited category. I am of the view that it does not.

The proofs disclose that prosecutor is engaged in the business of vending scrap iron, steel and metal. It has places of business in this country and in Europe. It has used the *locus* merely as a shipping station, and sought the certificate of occupancy as a warrant for continuing that use. It is designed to employ the premises for the storage of these commodities only as an incident to this primary use. The material is to be placed on boats and barges moored in the adjoining river for transportation to the Newark Bay, and thence to distant ports. It is not intended to devote the premises, nor has such use been made of them, to the cutting, sorting, treatment, or processing of the scrap metal. Only select steel scrap, classified as Grade No. 1 and Grade No. 2, "heavy melting steel scrap cut to mill size by the original sources," is to be shipped from this depot. The pieces of scrap so graded do not exceed five feet in length. Those comprised in Grade No. 1 "must not exceed eighteen inches" in width, and "be at least a quarter of an inch * * * in thickness," while the pieces falling into Grade No. 2 "must be over eighteen inches wide, and may run from one-eighth of an inch * * * to a quarter of

an inch in thickness." There is no equipment upon the premises except an electro-magnet crane used for the lifting of the metal pieces to the moored vessel.

The lands are not to be used for the purchase or sale of such materials. These transactions are to be carried on elsewhere; and the deliveries to prosecutor's premises will ordinarily be made by the dealers in their own vehicles. Normally, the material thus delivered will be loaded on the vessel directly from the dealer's truck. On the occasions when that course is not feasible, the delivered merchandise will be stored not "more than the length of time it takes * * * to load a scow, probably not more than three to five days at the most." Such has been the practice in the past.

The ordinance does not define the hyphenized term "junk-yard;" and it is not known to the dictionary as such. It has no commonly accepted meaning to serve as a guide in the ascertainment of the legislative intent; and so recourse must be had to the ordinary, primary sense or meaning of the individual words thus compounded for their conjunctive significance.

The word "junk" is of nautical origin, and originally signified (a) an old or inferior cable or rope; and (b) old cable or rope material, cut up in short lengths and used for making fenders, reef-points, gaskets, oakum, &c. A junk-shop was "a marine store, the shop of a junk-dealer." *Oxford English Dictionary.*

The term "junk" now has a wider meaning. It denotes old iron, glass, paper, cordage, or other waste which may be treated so as to be used again in some form; also, any old or discarded material, as metal, paper, rags, &c., and, in general, anything that is regarded as worthless or merely trash. *Webster's New International Dictionary* (2d ed.); *New Century Dictionary.* The modern definition of "junk-shop" is "the shop or place of business of a junkman." *The New Century Dictionary.* It is a place "where odds and ends are purchased and sold; a store where old metals, ropes, rags, &c., are bought and sold." *City of Duluth* v. *Bloom,* 55 *Minn.* 97; 56 *N. W. Rep.* 580; 21 *L. R. A.* 689; *Commonwealth* v. *Ringold,* 182 *Mass.* 308; 65 *N. E. Rep.* 374; *Charleston City*

*Council* v. *Goldsmith* (*S. C.*), 12 *Rich. Law* 470, 473. See, also, *Smolensky* v. *City of Chicago*, 282 *Ill.* 131; 118 *N. E. Rep.* 410.

The pertinent signification of the word "yard" is an enclosure, with or without buildings, devoted to some "work or business," as, for example, a brickyard; dockyard; tanyard; lumberyard; stockyard. *Webster's New International Dictionary; Oxford English Dictionary.*

There is no occasion to consider whether the term "yard," so compounded, has reference merely to the character of the *locus* or site of operations, and otherwise has the same connotation as "shop," *i. e.*, a place where junk is "bought and sold." While the term has other and more general uses than those above outlined, I am of the view that, considered in the light of the context, the conjoined words "junk-yard" are not susceptible of a broader meaning than a place where the "junk business" is carried on as such. Otherwise, the mere storage of material answering the description of "junk" would bring the premises within the interdicted class. If that were so, storage of such material on a wharf or dock, preparatory to shipment, would constitute the premises a "junk-yard." Certainly, this was not the intent of the ordinance; at least, this all-embracive definition, assuming the power thus to legislate, is not to be accepted in the absence of language unmistakably denoting that purpose. The mere "deposit" of material so classified, preliminary to loading on vessels for shipment, does not suffice to bring the premises within either the letter or the spirit of the ordinance. Such is the use to which these particular premises are to be devoted. The designed use is in the nature of stevedoring rather than the maintenance of a "junk yard;" and the denial of a certificate of occupancy for this purpose was therefore in contravention of the ordinance and otherwise without authority in law.

The judgment under review is accordingly reversed, with costs; and the cause is remanded for further proceedings upon prosecutor's application in consonance with this opinion.