This matter comes on by a stipulation as to facts and the filing of briefs.
On or about March 4, 1948, plaintiff applied to the defendant, as Clerk of the City of Trenton, for a license to operate a junk yard in the City of Trenton. Again in January, 1949, *Page 618 
plaintiff applied to the defendant for a license to conduct a junk yard at the same premises for the year, 1949.
The defendant, as Clerk of the City of Trenton, declined to issue such licenses contending that the plaintiff was not engaged in the conduct of operating a junk yard, but was engaged in the business of buying and selling scrap iron and steel and other metals, and, accordingly, was in the category as provided by the ordinance entitled, "An Ordinance governing and regulating and fixing license fees of certain businesses in the City of Trenton," adopted December 11, 1947.
The facts being stipulated, the pertinent parts are hereinafter set forth:
"Plaintiff corporation has its place of business on Muirhead Avenue, Trenton, New Jersey, which it has conducted since 1944. Plaintiff engages in the business of purchasing, processing and selling used metals of all kinds. It purchases metals from sellers located both within and outside of the city. These metals are brought to the plaintiff's place of business where they are subjected to a processing procedure. The plaintiff cuts the metals, sorts them in accordance with their metallic content, treats them and in general performs all other processes necessary to place their product in form necessary for sale. To this end, it has on its premises, an open-air yard, machinery required for this function, such as: shears, acetylene and oxygen cutting equipment to burn or cut the metals, air compressors for pneumatic cutting, welders to cut both non-ferrous and ferrous metals, overhead crane with magnets to unload and load metals in cars and truck cranes. The plaintiff purchases metals in forms for which they have no further utility. This consists of old or abandoned machinery of all kinds, old automobile bodies, surplus government metallic property and ordnance equipment no longer usable and so forth. In short, the plaintiff purchases old and discarded items that have metallic salvage value and which are no longer usable in their present form. In its yard, the plaintiff processes these items, salvages the metals contained therein and places the metals in condition for resale as used metals. The plaintiff does not sell used machinery or the like for *Page 619 
reuse in the same state as purchased, nor does it recondition any of the items purchased for resale in their original state. The plaintiff then sells the metals thus prepared and processed to mills, which, in turn, use these metals for smelting and manufacturing of new metals and metal products. The business function of the plaintiff, broadly speaking, is to collect old metals no longer of utility in their present state, process and segregate the same, and to channel them to purchasers who use the old metals for the manufacture of new metal and metal products.
"In 1907 the City of Trenton adopted an ordinance providing that no person could operate a junk yard unless duly licensed by the City, the license fee being then prescribed as $100 per year. In 1948 the City increased the amount of the fee to $200 by the passage of an additional ordinance. The 1907 ordinance further provided that the licensee was under a duty to enter into a bond in a stipulated amount; that the licensee was authorized to keep for purchase and sale junk, rags, old rope, old iron, brass, copper, tin, lead and other metals, old bottles, or any second hand articles. It further provided that a junk yard keeper could not purchase articles from a minor, apprentice or servant, limited the hours of doing business between 7:00 A.M. and 6:00 P.M., provided for the maintenance of purchase and sales records, and also provided for the right of inspection by city authorities.
"In 1947, the City adopted another ordinance, which provided that all business not specifically covered by other licensing ordinances of the City, would be under a duty to obtain a license to carry on such business. The rates for such licenses to be determined by the amount of the gross receipts of the licensee during the previous year. This ordinance likewise contained provisions as to the keeping of records as to purchases and sales. It further contained a provision that the City authorities were to have the right to inspect the premises of all licensees in order to report any violations of the City, County and State statutes and regulations relating to the preservation and protection of the lives, health and morals and the general welfare of the City inhabitants." *Page 620 
Therefore, the question before the court arising from the foregoing state of facts is, whether the plaintiff is engaged in the conduct and operation of the business of a junk yard or junk dealer as contended by the plaintiff, with an annual license fee in the amount of $200, or whether it is engaged in the business of buying and selling scrap iron, steel and other metals, and therefore subject to the provisions of the Ordinance of 1947 relating to the selling of goods, wares and merchandise and other tangible personal property and subject to an annual license fee of $800 for the year 1948 and the sum of $1,000 for the year 1949.
Plaintiff having paid these amounts seeks not only to obtain a license to operate a junk yard under the ordinance of 1907, but seeks further the return of the sum of $1,400 which seems to have been paid under protest pending a determination of its status under the respective ordinances.
There is no dispute between the parties as to the validity of the ordinances so enacted.
Junk dealers and junk yards are to most of us whose memory goes back many years, a place where all sorts of articles were the subject of purchase and sale. It may be that I will not be understood when I recall that small boys would "pick a dump," load the loot in burlap bags and trudge off to the junk yard, then would come the very important negotiations with the hopes that the treasure would realize sufficient pennies for at least a day's supply of hard and durable confectionery, commonly called, "all day suckers."
The horse and wagon with its bells attached moving slowly through the streets of the small towns and boroughs served notice that a "junk dealer" or "rag picker" was ready to do business with anyone for most any sort of merchandise such as rags, old rope, iron, paper, lead, bottles and the like.
Perhaps now, like most things, the junk business has gone modern, but it may be said that impressions made in early life are lasting and I hope will not unduly affect the determination of the problem at bar.
In Grace Iron Steel Corp. v. Ackerman, 123 N.J.L. 54, Justice Heher in characterizing the business of an applicant *Page 621 
for permission to use a tract of land on the Passaic River for the loading of scrap iron and steel on scows and the storage thereof, said, at p. 57, "The term `junk' now has a wider meaning. It denotes old iron, glass, paper, cordage, or other waste which may be treated so as to be used again in some form; also, any old or discarded material, as metal, paper, rags, etc., and, in general, anything that is regarded as worthless or merely trash."
In City of Chicago v. Iroquois Steel and Iron Co.,1 N.E.2d 241-244, "Scraps of new iron and steel left from manufacturing processes, and iron and steel recovered from buildings being wrecked and from parts of automobiles cut to sizes to meet specifications of steel mills and foundries, are not junk within the provisions of the ordinance and under the decisions cited."
It is unnecessary to comment on the many authorities of Sister States cited in defendant's brief except to say that there seems to be ample precedent to hold that a junk shop or junk dealer's place is one where the materials dealt in are of a varied kind, quantity and value.
Here, the plaintiff engages in the business of purchasing and processing and selling only used metals. The materials as brought to the plaintiff's place of business are subject to a processing procedure; are cut and sorted in accordance with their metallic content; and as thus prepared and processed, sold to steel mills. "The business function of the plaintiff, broadly speaking, is to collect old metals no longer of utility in their present state, process and segregate the same, and to channel them to purchasers who use the old metals for the manufacture of new metal and metal products." (See page 2 of stipulation of facts.)
It may be of no significance, yet, it is interesting to note that while the plaintiff has been doing its business in the City of Trenton since 1944, it did not make application for a license under the ordinance to license and regulate junk shops and junk dealers, enacted 1907, until after the enactment of the ordinance of 1947, which had to do with the regulating and fixing of license fees of certain businesses in the City of *Page 622 
Trenton and which latter ordinance made the required license fee of greater cost to the plaintiff than the amount due under the 1907 ordinance.
It is apparent that during the years of 1944 through and including 1947, the plaintiff did not consider itself in the junk business, a position with which this court is entirely in accord.
I find and determine that the plaintiff is no dealer in junk. Its type of business, its volume, its specialty of buying second handed metals, processing them and selling to steel mills, is far and away from that which can be called the doing of the business of a junk dealer or the maintaining of a junk yard.
There will be judgment in favor of the defendant and against the plaintiff. A form of judgment in accordance with these conclusions may be submitted.