269 So.2d 88

**COME, an unincorporated Association of citizens, et al.**

v.

**Jim CHANCY et al.**

**SC 37**

Supreme Court of Alabama.

Dec. 21, 1972.

Drake, Knowles & Still, University, for appellants.

J. Wagner Finnell, Glenn N. Baxter, E. D. McDuffie, Tuscaloosa, for appellees.

HARWOOD, Justice.

The appellants here brought a declaratory action in the Circuit Court of Tuscaloosa County, in Equity, seeking a decree declaring a zoning ordinance enacted by the Tuscaloosa City Commission to be invalid, and praying for an injunction restraining the City Commission and the Alabama Mental Health Board, the owner of the property affected, from doing any act furthering the use of that property under the authority of the questioned ordinance.

Since the parties on this appeal occupy the same positions as they did in the court below, we will refer to the appellants as the complainants and the appellees as respondents.

The complainants are an unincorporated association known as the Committee on Municipal Environment (C.O.M.E.) composed of the following individuals: Iredell Jenkins, Hazel Brough, Wyllys G. Stanton, John Luskin, and Francis X. Walter. These individuals are property owners residing in the vicinity of the property affected.

The respondents are the Tuscaloosa City Commission, and its members individually, and the Alabama Mental Health Board and its trustees individually.

Each of the respondents filed demurrers to the bill which were overruled, and answers were then filed. Testimony was then taken ore tenus and then submitted for final decree. The Chancellor thereafter made findings of fact and entered a decree denying all relief sought by the complainants, and dismissing the bill. From that decree this appeal was taken.

Complainants contend that the zoning ordinance was not enacted in accordance with a comprehensive plan, constituted illegal "spot" zoning, and was arbitrary and capricious.

The property concerned herein lies within the corporate limits of the City of Tuscaloosa and is known as the "Northington Campus." It was formerly owned by the University of Alabama, having been transferred to it in 1948 by the War Assets Administration after it was used as an Army hospital during World War II. The transfer was subject to a 25-year recapture clause in the event the land was again needed for a hospital. The recapture period lapsed in 1968 after a petition for reduction of it to 20 years was granted, and the University received the land in fee simple.

After World War II, the Northington property was used for classrooms by the University. This was shortly discontinued, and the property was converted to student apartments and recreation. This use, in addition to storage, continues today. The only commercial use of the property is a short-term lease of a portion of the property to a laundering firm.

In the late 1960's the University of Alabama and the Mental Health Board began negotiations regarding the acquisition of the Northington Campus property by the Mental Health Board. A committee was appointed in November of 1969, consisting of three members from the board of each institution.

Several meetings of the committee culminated in the following agreement on January 13, 1971. The Mental Health Board received the 116-acre Northington tract

and a 254-acre parcel of land in Jefferson County from the University of Alabama, in exchange for a 225-acre tract of land owned by Bryce Hospital which is located east of and contiguous to the main University campus. A condition in this agreement provided that the Northington property be rezoned from institutional to commercial. This rezoning is the subject of this lawsuit.

The interest of the University in this exchange was its need to acquire property contiguous to its main campus and the Bryce Hospital Acreage was ideal for this purpose. The University was not concerned with any commercial development.

The transaction was based on the appraised commercial value of the Northington tract and it was determined that its highest value would be for commercial uses, instead of recreational or institutional use. No comprehensive studies were made regarding the effect of the proposed rezoning on the remainder of the city.

J. Rufus Bealle, Executive Secretary of the Board of Trustees, and General Counsel and Land Commissioner of the University of Alabama, was called to testify by the complainants. He had presented the rezoning petition before the Tuscaloosa Planning Commission, representing both the University and the Mental Health Board. He recounted his statement before the Planning Commission which explained the interests of both parties. He stated that the 225-acre Bryce Hospital tract was surplus to its medical needs. The Mental Health Board was in need of funds and it was desirable that the Bryce property be disposed of toward satisfying this need. The University wished to expand its main campus on contiguous lands rather than retain the Northington property, but did not have the funds to purchase the Bryce tract for campus expansion. A trade, conditioned on the rezoning of the Northington tract, thus allowing the Mental Health Board to realize funds from commercial development, was determined to be the best method to further the interests and needs of both parties.

The Tuscaloosa Planning Commission is the initial body before which rezoning petitions are presented. Its duty is to study the requests and make recommendations to the Tuscaloosa City Commission. After a full public hearing, the Planning Commission on December 4, 1970, ruled favorably on the petition and recommended that rezoning take place. The City Commission likewise after a full public hearing, on December 22, 1970, enacted Ordinance No. 1653 which rezoned the Northington Campus from "I" (Institutional) to "B-1" (Business). Thereafter on March 26, 1971, the complainants herein filed their bill in the Circuit Court of Tuscaloosa County attacking the validity of this ordinance, and praying that the Chancellor declare the same invalid.

The institutional zoning classification permits "any functional use normal to the operation of the institution," while under the "B-1" classification, designated types of neighborhood retail stores and markets, and specified types of neighborhood service businesses are permitted. Chapter 35, Code of the City of Tuscaloosa, Alabama.

As before stated, the Northington Campus property covers 116 acres within the corporate limits of the City of Tuscaloosa. The land is basically rectangular in shape and is surrounded on three sides by major thoroughfares. On the north side, the property is bounded by 15th Street East, an east to west street which runs almost its entire distance through the city. It is a four lane divided street, except midway through the northern boundary of Northington, it narrows into a two lane undivided street. The western side is bounded by the U. S. 82 By-pass, otherwise known as McFarland Boulevard, a major divided four lane highway which intersects Interstate 59 to Birmingham to the south and to the north crosses the Black Warrior River at the Woolsey Finnell Bridge and proceeds onward. To the south of the property is Hargrove Road, an undivided four lane street. The east side is unbounded by any street or highway, though adjacent thereto are the Shelton Trade School, the

Northington Elementary School, a few residences, and open land.

The Northington Campus lies in the approximate geographical and population center of the city. The general vicinity can be described as a combination of commercial and residential property. The entrance of commercial activity into this area is relatively recent.

Hazel Brough, a complainant in this action, has resided in the area for sixteen years and lives southeast of Northington and one block off Hargrove Road. She testified that when she moved there the only commercial activity was a few small businesses at the southeast corner of Hargrove Road and what is now McFarland Boulevard. The entire area was then a new residential development.

Iredell Jenkins, another complainant, moved to the area in 1961 and testified to this same effect.

John Luskin, a complainant, lives on 7th Avenue East which is one block west of and parallel to McFarland Boulevard. When he moved there in 1954, the only commercial activity was a grocery store at the corner of 6th Avenue East and 15th Street East. The back of Mr. Luskin's home faces McFarland Boulevard. There is, however, a ten foot strip between his backyard and the street, which is now owned by the Mental Health Board. When he moved there, there were trees on this strip giving it a "rustic" look, which has since been destroyed by the new highway. Therefore, until the mid-1960's, the area could be categorized as chiefly residential with a few isolated commercial establishments.

With the passage of time, the area in the Northington vicinity which was mainly residential, has changed. While the neighborhoods have remained residential, three major thoroughfares have been developed principally along commercial lines. The southeast and southwest corners of Hargrove Road and McFarland Boulevard contain businesses, such as a service station and a restaurant. That part of 15th Street East, west of its intersection with McFarland Boulevard is, lined with commercial activity: service stations, restaurants, offices, shoe stores, etc. McFarland Boulevard, between Hargrove Road and Skyland Boulevard, is almost equally as commercial. Also, at the northeast corner of these two roads, lies McFarland Mall, a large shopping center which serves the needs of not only this area but the entire city as well. This area therefore appears to be a rapidly developing commercial area along these major thoroughfares.

The Northington Campus, however, has remained relatively static since its acquisition by the University of Alabama in 1948. The southern portion has always been open land used by the public for recreational purposes. The northern part is composed of former hospital buildings and a network of streets between them. Originally, there was a swimming pool, open space, tennis courts, old buildings which originally composed an Army hospital, school, theater, and a church. These structures remain except where a fire college was built on part of the open land and where the construction of McFarland Mall caused the removal of the swimming pool and a few of the buildings. Generally, the structures on the land are in a deteriorating condition. The Northington property originally covered the land which is now McFarland Boulevard between 15th Street East and Hargrove Road.

The complainants in their bill pray for a declaratory judgment holding Ordinance No. 1653 void, and for an injunction prohibiting the members of the Tuscaloosa City Commission from doing any act allowing the commercial development of the Northington property, and prohibiting the trustees of the Mental Health Board from commercially developing the land, and from doing any act inconsistent with the allowed uses under the institutional classification.

The court denied relief, decreeing that "the action of the Commission Board was in no way arbitrary or capricious, and does not amount to illegal spot zoning, and the

Court finds the issues herein in favor of the Respondents."

On this appeal, the complainants contend, (1) that Ordinance No. 1653 was not passed in accordance with a comprehensive plan, (2) that the rezoning of the Northington property constituted illegal "spot" zoning, and (3) that the action of the Tuscaloosa City Commission was arbitrary and capricious.

No questions are raised as to the procedures by which this ordinance was adopted.

Our zoning laws require that "[zoning] regulations shall be made in accordance with a comprehensive plan." Alabama Code, Title 37, § 777. We have found no Alabama cases which set out the elements that a comprehensive plan should include. We do not deem it necessary to go into this matter, in fact, we have doubts as to whether a precise formula could be made, given the complexity of the problem and the fact that no two communities are exactly alike.

The issue before us is whether Ordinance No. 1653 was passed in accordance with a comprehensive plan, rather than whether the entire Tuscaloosa zoning scheme consisting of certain studies and plans mentioned hereinafter must be deemed a part of the comprehensive plan.

We note that it was stipulated that Chapter 35 of the City Code of Tuscaloosa, Alabama, together with the zoning map of the City constitutes the comprehensive zoning ordinance of the City.

Complainants' argument in part revolves around the following statement in their brief:

"The thrust of the judicial statements and the Alabama statutory requirement of a 'comprehensive plan' is that the comprehensive plan is something separate and apart from the (implementing) zoning ordinance."

Underlying this appears to be the contention that a comprehensive plan includes all of the studies, plans, and projections designed as an ideal "master plan" controlling the future growth of a city, and to which all zoning ordinances and amend-ments based on a comprehensive plan must conform.

To further this argument, counsel makes reference to four project reports which, with the zoning map, complainants contend compose the major elements of Tuscaloosa's comprehensive plan. We will here give a brief description of each of these reports and the portions thereof which relate to the Northington property.

1. *Neighborhood Analysis Study for City of Tuscaloosa, Alabama.*

This study was prepared by a private firm for the City of Tuscaloosa and was submitted to the Department of Housing and Urban Development (HUD) as a part of a long range plan of city development. Major C. Snow Hinton testified that this plan takes into account "all of the factors that go into making up a city," most of which would also go into the construction of a comprehensive plan.

2. *Land Use Plan.* This plan was prepared by a private firm for the Tuscaloosa Area Council of Local Governments in April 1969 pursuant to a grant from HUD. It is a projected land-use plan for growth until 1990. On July 18, 1970, the Tuscaloosa City Planning Commission adopted this study "as the Land Use Plan for the City of Tuscaloosa." A future land-use map of the city projects the northern part of Northington as "public, semi-public & institutional," and the southern portion as "public recreation-proposed." No proposals for the commercial development of Northington appear in this study. This project advised that the University of Alabama acquire more lands adjacent to the main campus in order to expand properly. The best land for this purpose would first be the Bryce property located east of the University and secondly some other Bryce land located at the northeast intersection of McFarland and University Boulevards. The former is the land acquired by the University from the Mental Health Board. It is bound on the north by the L & N Railroad, on the

east by McFarland Boulevard, on the west by the University, and on the south by University Boulevard. The project further pointed out that McFarland Mall will be the dominant shopping center during the early part of the planning period, though there is land available for further future expansion. This study also states that the city presently needs 9700 acres of open land to meet existing deficiencies. An additional 2622 acres will be needed by 1990.

3. *Tuscaloosa Area Transportation Study, Volume 1.* This was prepared by the Alabama Highway Department in cooperation with the U. S. Department of Transportation and is dated August 1970. This project portrays the Northington property as "institutional" on a map projecting 1985 land uses. We note that this is different from the classification of the *Land Use Plan.* Mayor Hinton testified that the city had "adopted" this plan. This study provided further that "changing conditions and technology require continual re-evaluation and adjustments of the plan."

4. *Community Facilities Analysis and Plan.* This was prepared by a private firm for the city and is dated July 1969. It was adopted on July 18, 1970 "as the Community Facilities Plan for the City of Tuscaloosa." This study recommends the acquisition of the southern 40 acres of Northington by the city from the University of Alabama as a desirable recreational area. It also states that the Northington Elementary School (located east of and adjacent to Northington) is in need of an additional 5.3 acres and one classroom. Further recommendations were that parks should be located next to elementary schools and within 1/4 to 1/2 mile of each home. Also, larger community parks should be built from one to three miles from every home. In connection with these recreational needs, Mayor Hinton testified that even though the City-County Park was present in the Northington area, more recreational land was needed, but the city could not afford

to purchase the Northington open land for this purpose.

Throughout the testimony regarding all of these plans is the fact that they are not hard and fast guidelines. All of them are projected uses which are intended to be updated every few years. In fact, the long range plans are required to be revised every two years.

Complainants seek to elevate the above studies and projects to that of a "master" plan which would restrict and control every zoning ordinance. As averred in their brief:

"Once the city has adopted such 'master plan,' both statutory law and good sense demand that the city's zoning bear some functional relationship to this plan. That, after all, is the purpose of creating the plan in the first place . . . . The clear meaning of § 777 is that cities should adopt long-range or master plans . . . ."

Reliance is then placed on a Washington case which differentiates between municipal "planning" and "zoning:"

"Thus, it may be observed, 'planning,' in the broad sense, contemplates the evolvement of an over-all program or design of the present and future physical development of the total area and services of the existing or contemplated municipality . . .

"Municipal 'zoning' on the other hand, is, in effect, a part of and an end result or product of effective municipal 'planning,' for it is through the medium of enacted and enforceable zoning regulations that the aims and objectives of the land-use-classification facet of over-all municipal 'planning' may be carried to fruition. Because an ad hoc, piecemeal approach to municipal 'zoning' lends itself more readily to arbitrary, capricious, unreasonable, or spot zoning situations, it follows that there must be a direct and tangible link between over-all municipal 'planning' and over-all municipal 'zoning.' "

Shelton v. City of Bellevue, 73 Wash.2d 28, 435 P.2d 949, 953.

■ We do not doubt that the above quotation from the *Shelton* case is sound advice to any municipality in implementing land-use and zoning programs. Cities should be encouraged to formulate long range plans encompassing all facets of municipal development as Tuscaloosa has done with the four studies we have previously discussed. Such projects are of course only guidelines to be used in directing proper growth of a municipality, and zoning ordinances should be drafted to further the main objectives. Even though such master guidelines should be a helpful basis in all zoning legislation, the former does not occupy a position of legal superiority over the latter. The entire collection of zoning maps, zoning ordinances, and master plans or guidelines constitutes the basis for a comprehensive zoning plan of a municipality. It is, however, the ultimate zoning ordinance, the product of all of the above, that must govern.

Tuscaloosa does have a comprehensive plan for zoning the entire city. What complainants contend is that the rezoning of Northington to a business classification is invalid as being contrary to the *Land Use Plan* which denotes the property as "public, semi-public, & institutional" and "public recreation-proposed" and states that the city is in need of recreational land, and contrary to the *Tuscaloosa Area Transportation Study* which portrays the land as "institutional," and contrary to the *Community Facilities Analysis and Plan* which recommends acquisition of Northington by the city for recreational purposes, describes the need for more city parks, and points out needed improvements in the adjacent Northington Elementary School. These three plans have been adopted by the city, but this does not increase their status beyond that of being guidelines.

As stated above, Tuscaloosa does possess a comprehensive plan. There are the implementing zoning ordinances and the master guidelines for projected future growth. The entire city is taken into account with a view toward anticipated fulfillment of its needs.

It can hardly be said that the Tuscaloosa plan is analogous to those in Johnson v. City of Huntsville, 249 Ala. 36, 29 So.2d 342, and Chapman v. City of Troy, 241 Ala. 637, 4 So.2d 1. Both of these cases involved attempts to enact zoning ordinances covering only a portion of a city leaving certain remaining parts unzoned. We held that neither was in accordance with a comprehensive plan. In *Chapman*, the court stated as follows:

> "If the governing body of the smaller city undertakes to deal with the entire matter, it is contemplated the welfare of the whole city be kept in view. Hence, a comprehensive plan.
>
> \*   \*   \*   \*   \*   \*
>
> "A single ordinance laying off a small portion of the city as a residence district, taking no account of other areas equally residential in character; and so far as appears without any comprehensive plan with a view to the general welfare of the inhabitants of the city as a whole, is not permissible. Piecemeal ordinances are not favored."

■ The requirement of Section 777 of a comprehensive plan merely means that zoning ordinances must be enacted with the general welfare of the entire community in mind. Such could hardly be the case in the *Johnson* and *Chapman* decisions. Our statute does not require a city to be bound by a "master" plan (studies made for assistance in formulating a comprehensive plan), as a condition precedent to the enactment of zoning ordinances. In fact Section 779, Title 37, Code of Alabama, 1940, gives a city express authority to amend its comprehensive plan by changing an area from one use to another.

■ We now turn to Ordinance No. 1653. If a city does have a comprehensive plan and undertakes to amend that plan by changing an area in it from one use to another, then the amendment thereby becomes a part of the comprehensive plan and is not violative of Section 777. Alabama Code, Title 37, § 779; Episcopal Foundation v. Williams, 281 Ala. 363, 202 So.2d 726; Shell Oil Co. v. Edwards, 263

Ala. 4, 81 So.2d 535, cert. denied, 350 U.S. 885, 76 S.Ct. 139, 100 L.Ed. 780. The ordinance at issue here is an amendment to the zoning map of the city of Tuscaloosa. Its passage displaced all contrary provisions of the comprehensive plan and became a part thereof. The requirement of Section 777 was therefore met and the ordinance was "made in accordance with a comprehensive plan."

We now discuss the reason for the classifications of the Northington property found in the *Land Use Plan* and the *Tuscaloosa Area Transportation Study*. Mr. Gary M. Cooper, a member of the private firm which prepared the former plan, testified that when land is owned or used by an institution, in projecting future use, the planner would attempt to learn the institution's future plans and if no express intent to abandon the institutional use was evident, the plan would then reflect this institutional classification. No such intent was expressed before this plan was made. The southern portion was described as recreational because it was so used. The latter plan classified Northington as institutional because no other uses or changes by the University were known at the time.

■ From the foregoing, it should be readily apparent that these four projects or studies were not intended to be enabling documents to zoning ordinances. The Northington classifications were based on the then use of the property because no other future use was known. This could hardly be a rigid blueprint for the future development of this area.

Complainants further contend that this ordinance constitutes "spot" zoning.

■ Under our cases, "spot" zoning is piecemeal zoning or zoning a spot not a part of a comprehensive plan. In Shell Oil Co. v. Edwards, 263 Ala. 4, 81 So.2d 535, we stated that "the zoning of a 'spot', not a part of a comprehensive plan, is not authorized by law. . . . This ordinance as amended being a part of a comprehensive plan is not 'spot' zoning." Also see Episcopal Foundation v. Williams, 281 Ala. 363, 202 So.2d 726. The most recent pro-

nouncement by this court on the subject of "spot" zoning was made in Haas v. City of Mobile, 289 Ala. 16, 265 So.2d 564. We stated as follows:

"The basic contention is that this ordinance constitutes 'spot' zoning. This court has long condemned 'spot' or 'piecemeal' zoning, where the facts show municipal officials have attempted partial zoning of a municipality. Chapman v. City of Troy, 241 Ala. 637, 4 So.2d 1; Johnson v. City of Huntsville, 249 Ala. 36, 29 So.2d 342. Recent decisions have limited condemnation of 'spot' or 'piecemeal' zoning to the situation where there has been no comprehensive plan. See Shell Oil Company v. Edwards, 263 Ala. 4, 81 So.2d 535 and Episcopal Foundation of Jefferson County v. Williams, 281 Ala. 363, 202 So.2d 726, which recites the proposition that where an existing comprehensive plan is in effect, no amendment thereto can be attacked as being 'spot' zoning. These decisions place this jurisdiction in a unique position regarding the issue of 'spot' zoning. The majority position is that rezoning of a small tract of land out of harmony and in conflict with a comprehensive plan may constitute 'spot' zoning. See 1 E. Yokely, Zoning Law and Practice, § 8–3, at 363, (3rd ed. 1965), and cases annotated at note 6."

■ We have already held that this ordinance was enacted as a part of a comprehensive plan, therefore this holding is dispositive of the issue whether this ordinance constitutes "spot" zoning.

Even if this ordinance is tested against the "majority position" as stated in the *Haas* case, our discussion which follows indicates that this contention of complainants remains without merit. This rule, referred to in *Haas,* reads from Yokely's treatise as follows:

"Spot zoning amendments are those which by their terms single out a particular lot or parcel of land, usually small in relative size, and place it in an area, the land use pattern of which is inconsistent with the small lot or parcel so

placed, thus projecting an inharmonious land use pattern.

\* \* \* \* \* \*

"Of one thing there can be no doubt. The law is well settled that 'spot zoning' as properly known and understood, and 'spot zoning' ordinances, as properly identified, are invalid on the general ground that they do not bear a substantial relationship to the public health, safety, morals and general welfare and are out of harmony and in conflict with the comprehensive zoning ordinance of the particular muncipality." 1 E. Yokely, Zoning Law and Practice § 8–3 (3d ed.)

The land involved here is definitely not a small tract, but rather contains 116 acres. It is located in the approximate population and geographical center of the city. On three sides are major thoroughfares. Commerical development is not out of harmony with the general area as there are many businesses in the vicinity. Nevertheless, whether one follows the "majority position" or Alabama's apparent minority rule, there is no "spot" zoning here.

Regardless of the pronouncements concerning "spot zoning" appearing in our own decisions as well as those of our sister states, it appears to the writer that the term "spot zoning" is nothing more than a catchy phrase whose introduction into legal terminology has created only an illusory concept of no practical use.

■■ After all, the ultimate criteria in determining the validity of zoning ordinances, and amendments thereto, is whether the ordinance creates zones in such manner that the classifications are consistent with the land use pattern of the area, and bear a substantial relationship to the public health, safety, morals, and general welfare. The size and location of the property would necessarily enter into a determination of this question, which is primarily for the governing body of a political subdivision whose conclusions in the premises should not be judicially disturbed unless it be arbitrary and capricious, and therefore palpably wrong.

An arbitrary and capricious ordinance should be set aside whether there is, or is not, a comprehensive zoning plan, and any invocation of any theory of "spot zoning" would have to give way to the larger principle.

The final contention of complainants is that the ordinance is arbitrary and capricious. The argument is that Ordinance No. 1653 was passed solely to further the economic benefit of the University of Alabama and the Mental Health Board.

■ It is well settled that our review of the actions of municipal governing bodies in the matter of zoning, is quite limited. Zoning is an exercise of the police power of a city and is a legislative matter. In keeping with the doctrine of separation of powers as embodied in § 43 of the Alabama Constitution, considerable freedom and discretion are to be allowed local zoning officials. Walls v. City of Guntersville, 253 Ala. 480, 45 So.2d 468. Since, therefore, the court must not invade the prerogative of the legislature, the following rule regarding our scope of review has been enunciated in Allen v. Axford, 285 Ala. 251, 231 So.2d 122:

"\* \* \* if the question of zoning or rezoning is fairly debatable, a court will not substitute its judgment for that of the municipal government body acting in legislative capacity. \* \* \* However, the right of a governing body to enact zoning ordinances is not unlimited, and the ordinance must bear some substantial relation to the public health, safety, morals, general welfare, and general convenience."

In Waters v. City of Birmingham, 282 Ala. 104, 209 So.2d 388, we stated that:

"Further, if the adoption of the ordinance raises questions upon which reasonable differences may exist in view of all the circumstances, and the wisdom of the ordinance is fairly debatable, then the action of a municipal governing body in adopting the ordinance will not be deemed arbitrary, a court being unwilling under such circumstances to substitute its judgment for that of the munici-

pal governing body acting in a legislative capacity."

We cannot strike down a zoning ordinance unless it appears "that such an ordinance passes the bounds of reason and assumes the character of a merely arbitrary fiat." Episcopal Foundation v. Williams, supra.

Complainants are abundantly correct when they state that " '[f]inancial loss is not the test; the question is whether the scheme is sound, and the classification fair.' " Grayson v. City of Birmingham, 277 Ala. 522, 173 So.2d 67; Leary v. Adams, 226 Ala. 472, 147 So. 391. We are not concerned with the economic aspects of this ordinance or the land swap between the University and the Mental Health Board. Our review must be limited to whether the enactment of the ordinance was fairly debatable and one upon which reasonable men could be expected to differ. Cudd v. City of Homewood, 284 Ala. 268, 224 So.2d 625.

We believe that this ordinance is fairly debatable. It should be readily apparent from our prior discussion regarding the nature of the vicinity of the Northington Campus that the development of this land consistent with the "B–1" classification is not inconsistent with the character of the neighborhood. The general area is in transition. There is a substantial amount of residential property among the network of streets off the three main arteries bounding the Northington property. These principle thoroughfares, however, have already been highly and almost solidly developed commercially during the past decade and especially since the opening of McFarland Boulevard. Businesses are located at the intersection of it and Hargrove Road, and 15th Street East west of McFarland Boulevard is virtually solid with commercial activity. Also, McFarland Boulevard, between Hargrove Road and Skyland Boulevard, is rapidly becoming dotted with service stations, restaurants, stores, and assorted businesses. Furthermore, the Northington property is located in the approximate geographic and population center of the city. We cannot with justification say that the action of the City Commission was unreasonable in allowing the Northington property to yield to the current trend of this area and to be developed pursuant to a "B–1" classification.

We now consider the arguments of complainants relative to the recreational use of this property. Mayor Hinton testified that it was desirable that the City of Tuscaloosa purchase this land for recreational purposes, but the city could not afford it. Moreover, the land, prior to Ordinance No. 1653, was listed under an "institutional" classification as the private property of the University of Alabama, not recreational. Any recreational use of the property by the public was pursuant to the mere license on the part of the University, not to any legally enforceable right or ordinance.

Several of the complainants testified that they moved to the Northington area because of its residential character and because of the open spaces in the vicinity, and improvements were made on their homes in reliance on their belief that commercial activity would not intrude into their neighborhood. The argument is that they had a right to rely on the existing zoning structure in making these improvements in the 1960's. However, two of these property owners testified that they were aware of the planned construction of McFarland Boulevard. Furthermore, the increasing commercial development in this area during the past few years was open and obvious. Nevertheless, this contention is answered by our decision that this ordinance was a valid exercise of the city's zoning power. As we stated in Grayson v. City of Birmingham, 277 Ala. 522, 173 So. 2d 67:

"In the light of our holding that the establishment of vested rights in the appellants to the naked lots here under consideration is also dependent on the reasonable necessity for protecting and promoting the health, safety, morals, and

general welfare of the public, we hold that the appellants, under the circumstances here presented, did not acquire a vested right to the lots in question so as to make them immune from the zoning ordinance here under attack."

 Mindful of our limited scope of review in appeals contesting the validity of zoning ordinances, and the well settled rule that when evidence is taken ore tenus, a strong presumption exists in favor of the trial court's findings which can be overcome only when those findings are palpably wrong and unjust, we must affirm the decree of the Chancellor upholding Ordinance No. 1653. See Norman v. Jefferson County, 6 A.B.R. 600. We affirm.

Affirmed.

HEFLIN, C. J., and MERRILL, MADDOX and FAULKNER, JJ., concur.