This is an appeal by the Jaffe Corporation, Inc., from a decree of the Circuit Court of Colbert County holding that Jaffe was operating a junkyard in violation of the zoning ordinances of Sheffield, Alabama.
On appeal, the corporation contends that the ordinance's definition of a junkyard is unconstitutionally vague. The corporation also contends that its business does not fall with the definition of a junkyard enumerated by the ordinance. We disagree with both contentions.
This case was originally heard before the Building Inspector of the City of Sheffield pursuant to a petition filed by the residents of an R-1 residential district of that city. Their petition alleged that the corporation was violating a city ordinance by operating a junkyard in an M-1 district which is adjacent to the subdivision in which they reside. An M-1 district is a "Manufacturing District; Light Industry." Junkyards are excluded therefrom. The zoning ordinance defines a junkyard as:
 "Any lot or parcel of land on which is kept, stored, bought or sold articles commonly known as junk, including scrap paper, scrap metal, and used automobile bodies and parts."
The building inspector found that the Jaffe Corporation was not utilizing its property as a junkyard.
The residents appealed this finding to the Board of Adjustment of Sheffield. On June 19, 1975, a hearing was conducted by the Board on the matter. Both the residents and the corporation were represented at this meeting. On July 10, 1975, the Board reversed the finding of the building inspector and held that the corporation was operating a junkyard in violation of the Sheffield zoning ordinance. The corporation was enjoined from future operation of a junkyard on the premises.
On July 25, 1975, pursuant to Tit. 37, § 783, Code of Alabama 1940, as amended, the corporation through able counsel filed *Page 558 
written notice of appeal from the Board's order in the Circuit Court of Colbert County.
Among other grounds, this notice of appeal set forth as grounds therefor that:
 "(4) No proper notice of the pendency of said `notice of appeal' [to the Board of the Adjustment meeting] (Exhibit `B') was given to Jaffe.
 "(5) Jaffee was not a party to the alleged appeal (Exhibit `B') complained of and purportedly appealed from a determination and decision of the Building Inspector of the City of Sheffield, Alabama and is not bound by or obligated to comply with any finding of fact or order contained in Exhibit `A' [Order of the Board of Adjustment of Sheffield].
 "(6) Procedural due process as required by the Constitutions of the United States of America and the State of Alabama was not afforded to Jaffe."
A pretrial conference was held on April 14, 1976. The pretrial order issued pursuant thereto listed under a caption "positions of the parties," among others, the above quoted assertions by the corporation.
Trial was had in the Circuit Court of Colbert County on April 22, 1976. Evidence adduced therein reveals the following:
The property in question is located on the Tennessee River in Sheffield, Alabama. Prior to the Jaffe Corporation's operations thereon, Tennessee Valley Sand and Gravel Company used the property as a terminal or dock facility. Sand, gravel, coal, steel, various ores, aluminum slag, aluminum ingots, steel beams, and pig iron passed through the facility while operated by Tennessee Valley. These items were transferred to and from barges by cranes to which either a bucket or an electro magnet, depending upon the nature of items to be moved, was attached. Material from the barges was ultimately transferred to trucks and railroad cars and vice versa. Items remained in the open on the property for varying lengths of time awaiting pick up by the next mode of carrier.
The Jaffe Corporation has continued the terminal facility operation since it leased the property from Tennessee Sand and Gravel Company in November of 1974. As did the prior operator of the facility, the Jaffe Corporation uses cranes to load and unload barges, trucks, and railroad cars. The commodities handled by the Jaffe Corporation include steel coils, manganese ore, steel piling, steel beams, air pollution equipment, and at least one item not handled by its predecessor — scrap metal. Approximately 25% of the tonnage passing through the facility from November of 1974 until the time of trial consisted of scrap metal.
The president of the Jaffe Corporation, Ralph Jaffe, testified that "peddler's scrap" is a term commonly used in the junkyard business. He stated that it is purchased from an individual or "peddler" and consists of any type of ferrous or nonferrous scrap including tin, copper, zinc, old automobiles, and other items such as old paper, rags, and glass. He stated that the corporation does not purchase such material from individuals. Rather, the corporation purchases from scrap processing plants, junk dealers, brokers (who themselves purchase from junk dealers and scrap plants), plants whose by-products constitute scrap, and certain governmental agencies. He termed the material thus procured "processed or prepared scrap."
Prepared scrap may be classified into approximately 100 different categories. According to the president, the corporation bought approximately 5 different types: prepared foundry steel, prepared number 2 steel, prepared number 1 steel, cast iron, and unclean motor blocks. He stated these categories of items were purchased in truckload or freight car load quantities and stored in piles according to their classification until there was sufficient amount to contract with a consuming mill to purchase. He said the minimum barge freight charge assessed for the shipment of scrap to the consuming mill was 1,150 tons. Thus, the various types of scrap metal remain in piles on the corporation's property until such time as approximately 1,150 tons have accumulated for shipment to a consuming mill. *Page 559 
Frequently, these piles must be relocated on the property which necessitates handling the scrap several times. As previously stated, the scrap is moved by cranes which have electromagnets. The cranes pick up 1,000 to 2,000 pounds of scrap per lift. The metal is placed in the piles by dropping it from whatever height it has been raised to by the crane.
On cross examination, the president disclosed that wheel rims and unclean motor blocks are also piled on the premises for shipment to consuming mills for recycling. He stated that the taking of these items from discarded vehicles constituted all the "processing" necessary to render them suitable for recycling as basic components in metal manufacturing.
Jaffe also testified that the corporation cuts barges into pieces and sells the "barge scrap." The corporation procures the barge scrap by at least two methods. One method consists of pulling a barge from the river and cutting a twenty foot section from the remainder of the barge with a propane torch. The other method consists of having sections of a barge delivered to the dock by an individual with whom the corporation has specifically contracted for this purpose. The individual obtains these barge sections by raising sunken barges from the bottom of the Tennessee River. The sunken barges must be broken into sections to allow removal from the river bottom. Hence, according to the president of the corporation, this barge scrap is semi-processed when received by the corporation. Jaffe Corporation employees further process it by cutting it into smaller pieces at the dock where delivered.
Ralph Jaffe further testified that he owned two "partial junkyards and scrap metal processing plants" in Birmingham, Alabama. He distinguished the Jaffe Corporation's Sheffield operation from a junkyard by stating that a junkyard bought all types of material — steel, paper, rags, bottles, and primarily junk automobiles from peddlers. He stated that the junkyard salvaged the usable items so purchased, e.g., car radios, tires, etc., and resold them for their principal use and took the remaining junk and converted it by utilization of an automobile shredder, a bailing press, or a shearer into a form that was usable as a raw material in the steel making process. He emphasized that the corporation does not salvage any item for resale in its principal use. For example, the engine blocks on the corporation's premises were not sold to be reinstalled in automobiles, but were to be melted as an ingredient in steel manufacturing. Jaffe likened the sale of the scrap to that of a commodity, i.e., grain, salt, etc., for usage as a raw material in a manufacturing process.
Subsequent to the trial and prior to the rendition of the trial court's decree, the parties filed briefs to assist the court in reaching its decision. Appellant-corporation's brief failed to question the constitutionality of the ordinance which defined "junkyard."
On June 14, 1976, the trial court rendered its decision wherein it found that the keeping and storage of scrap metal and used automobile parts and the cutting up of wood and metal barges constituted the operating of a junkyard within the meaning of the Sheffield ordinance. The decree stated that:
 "[T]he Jaffe Corporation, Inc. is prohibited from using or continuing to use the property in question in this cause, which is located entirely in an M-1 zone, for the storage of processed used metal or as a junk yard, and also from using said property for the cutting up and rendering of steel or wood and steel barges for their metal. However, the Jaffee Corporation, Inc. shall be allowed 30 days from this date to remove from said premises any metal thereon resulting from the aforesaid two mentioned types of operations which are prohibited under this zoning ordinance. . . ."
On July 12, 1976, Jaffe presented a motion for a new trial, asserting as grounds therefor:
 "1. That the verdict or decision is not sustained by the great preponderance of the evidence. *Page 560 
 "2. That the verdict or decision is contrary to the law, in that the cutting up of steel barges with the use of an acetylene torch, prior to shipment of said scrap metal by barge, does not constitute a junkyard under the city ordinance prohibiting the operation of a junkyard in an M-1 zone."
This motion was denied by the trial court on August 4, 1976; the corporation thereafter prosecuted this appeal.
 I
As previously stated, the corporation contends the zoning ordinance's definition of junkyard is unconstitutionally vague. The corporation is precluded from raising this issue on appeal. It is axiomatic in Alabama that issues not raised in the trial court will not be considered for the first time on appeal.McDuffie v. Hooper, 294 Ala. 293, 315 So.2d 573 (1975); BibleBaptist Church v. Stone, 55 Ala. App. 411, 316 So.2d 340 (1975); 2 Ala.Dig. Appeal Error 169, 170 (2). To preserve an issue for appeal, a ruling of the trial court must have been invoked with respect thereto. Cox v. Howard Hall Company, 289 Ala. 35,265 So.2d 580 (1972); Talley v. A M Construction Company,284 Ala. 371, 225 So.2d 359 (1969), cert. denied, 397 U.S. 995,90 S.Ct. 1133, 25 L.Ed.2d 402 (1970); Smith v. State, 280 Ala. 241, 192 So.2d 443 (1966); Head v. Triangle Construction Co.,274 Ala. 519, 150 So.2d 389 (1963); Clancy Lumber Co. v.Howell, 260 Ala. 243, 70 So.2d 239 (1954).
The corporation contends the facts herein fall within an exception to the above principles. According to the corporation, this court may address the issue concerning the constitutionality of the ordinance by virtue of the holding inState ex rel. Knox v. Dillard, 196 Ala. 539, 72 So. 56 (1916). In that case the constitutionality of a statute had been raised by demurrer in the trial court and decided adversely to appellants. The trial court's ruling had been affirmed by the Supreme Court of Alabama. In petition for rehearing to the supreme court the appellants raised previously unasserted grounds for holding the statute unconstitutional. The supreme court allowed the constitutionality of the statute to be challenged on the theretofore unpresented argument, thus reversing its original opinion and declaring the statute unconstitutional.
 "The [original] petition under consideration brought into question the constitutional validity of the act . . . , but the reasons therein assigned for the assertion of its invalidity were not good . . . since the general allegation of the unconstitutionality of the act was efficient to invoke and to have justified a ruling, if made, of the court below that the act was invalid, not for a reason alleged, but on a ground or for a reason not particularly specified in the petition, the judgment now rendered cannot be affirmed here when, even for the first time on application for rehearing, the complaining party has fully met the burden of advising the court of the particular well-founded reason or ground for declaring the act invalid. . . ." (State ex rel. Knox v. Dillard, supra, 196 Ala. at 549, 72 So. at 60)
The corporation states that since the constitutional question was raised in both the petition and pretrial order below, the court may address that issue. We disagree.
First here, contrary to the facts in Dillard, the record fails to disclose that the constitutionality of the ordinance was challenged in the lower court. The corporation made no specific allegation of vagueness in its brief filed with the lower court, during the trial, or in its motion for a new trial. The corporation's only reference below to constitutional rights was its assertion, among seventeen other grounds for appeal from the Board of Adjustment to the circuit court, that it was denied "procedural due process." Read in context, as set forth above, it is obvious to this court that that statement referred to the corporation's alleged lack of notice to the hearing had before the Board of Adjustment — not to the constitutionality of the ordinance.
Moreover, even if the allegation of denial of procedural due process did in fact question *Page 561 
the constitutionality of the ordinance, this case would not be governed by Dillard, supra.
In Dillard, the sole issue before the lower court concerned the constitutionality of the statute. Although the specific basis on which the statute was ultimately declared unconstitutional was not set forth until the petition for rehearing was filed, the theory of the case as presented in both the trial and appellate courts remained constant. Here, appellant-corporation seeks review on a different theory than presented to the trial court. As stated by the Supreme Court of Alabama in Sealy v. McElroy, 288 Ala. 93, 98, 257 So.2d 340,344 (1972):
 "[A] case will not be reviewed . . . on a theory different from that on which the trial was had. . . ."
Other distinguishing facts preclude application of theDillard exception to the facts of this case. In Dillard, the constitutional infirmity related to failure of the legislatureto enact the law as prescribed by constitutional procedures. To have affirmed its original opinion and the decree of the trial court, the supreme court stated:
 "[T]his court would be placed in the wholly indefensible attitude of affirming a judgment that this court now is brought to know cannot be sustained because the essential basis thereof is an enactment that never became a law. . . ." (196 Ala. at 549, 72 So. at 60)
This court cannot equate an allegation of vagueness with the proposition that a law on which a judgment is premised was never enacted.
Additionally, we would note that the facts herein do not constitute "matters of public concern," existent in Dillard, such as to warrant treatment by this court of an issue not previously raised in the trial court. Talley and Smith, supra;B.F. Goodrich Company v. Butler, 56 Ala. App. 635, 324 So.2d 776
(1975).
For appellant-corporation's benefit, we do note that even had the issue been preserved for appeal, the conclusion we reach herein would remain unaltered, for we perceive no vagueness in the ordinance as applied to the circumstances of this case. The ordinance states that a junkyard is any lot or parcel on which is kept, stored, bought, or sold items commonly known as junk. It then specifies specific representative items deemed to constitute "junk."
A presumption of validity attaches to a zoning ordinance.
 "We must be certain that the ordinance is so plainly and palpably inadequate and incomplete as to be convinced beyond reasonable doubt that it offends the constitution or we will not strike it down." (Walls v. City of Guntersville, 253 Ala. 480, 485, 45 So.2d 468, 471 (1950))
See COME v. Chancy, 289 Ala. 555, 269 So.2d 88 (1972).
We cannot say the ordinance as applied in this instance is so "palpably inadequate and incomplete" as to warrant a decision by this court holding it invalid. While some degree of ambiguity inheres in any statute by virtue of limitations attributable to the written word, we fail to comprehend any inspecificity in the ordinance with regard to language which, when read in its entirety, forbids the keeping or storage of scrap iron upon the property. We consider the ordinance to give reasonable guidance to the corporation with regard to what activities may be conducted upon its premises. Additionally, we note that the validity of a similar definition of junkyard has been sustained in another jurisdiction against the very argument herein asserted. Board of County Commissioners ofCounty of Boulder v. Thompson, 177 Colo. 277, 493 P.2d 1358
(1972). But see City of Kewanee v. Riverside IndustrialMaterials Co., 21 Ill. App.2d 416, 158 N.E.2d 86 (1959); Cityof Watseka v. Blatt, 320 Ill. App. 191, 50 N.E.2d 589 (1943).
 II
The corporation contends its operation with respect to the processed scrap metal and the cutting up of barges does not constitute a junkyard within the meaning *Page 562 
of the ordinance. We differ as to this conclusion.
The ordinance's definition of junkyard has been set forth,supra. It states that the keeping or storing or scrap metal upon premises renders those premises a junkyard. Approximately 25% of the tonnage which has been handled by the Jaffe Corporation since it leased the property in question has consisted of scrap metal. The scrap remains on the premises for varying lengths of time until such time as it is loaded into barges. Hence, clearly scrap metal is kept or stored on the property in question, which activity constitutes the operation of a junkyard within the plain terms of the ordinance.
The corporation, in an excellent brief, advances numerous arguments and cites a number of cases in support of its contention. It states the type of activities it conducts have on other occasions been held not to constitute the operation of a junkyard. Eastern Scrap Salvage Corp. v. Burns,5 N.J. Super. 616, 68 A.2d 663 (1949); Grace Iron SteelCorporation v. Ackerman, 123 N.J.L. 54, 7 A.2d 820 (1939); Cityof Chicago v. Iroquois Steel Iron Co., 284 Ill. App. 561,1 N.E.2d 241 (1936). The cases so hold. However, they may be distinguished from the circumstances herein. In Grace, supra, the ordinance failed to define the term "junkyard." The court, citing Webster's International Dictionary, declared the term "junk" to denote: "old iron, glass, paper, cordage, or other waste which may be treated so as to be used again in some form; also, any old or discarded material, as metal, paper, rags, etc., and, in general, anything that is regarded as worthless or merely trash." (Grace Iron Steel Corporation v. Ackerman,supra, 7 A.2d at 821). No doubt, the preceding items do constitute junk. (The ordinance's definition of junk inEastern, supra, corresponds to that given by the court inGrace, supra.) However, the Circuit Court of Colbert County also had before it an ordinance which expanded that definition. The ordinance specifically declared that premises on which scrap metal was kept or stored constituted a junkyard.
Viewed in context of the zoning ordinance of which it is a part, we believe the trial court correctly determined that the ordinance contemplates the banning of the type of operations conducted by the corporation. The district in which the property is located is termed "light industrial." It is adjacent to a residential area. The zoning ordinance of Sheffield permits junkyards in the M-2 "heavy industry" districts. The shielding of residential areas from the loud noises necessarily associated with the movement and creation of large quantities of scrap is a purpose of the ordinance, and the construction given the ordinance by the trial court comports with the zoning scheme.
In Iroquois, supra, an operation similar to that of the Jaffe Corporation was also held not to constitute a junkyard, but no definition of junkyard was contained in the ordinance. Moreover, the determination of whether the activity constituted a junkyard was related to ascertaining whether its operator was required to obtain a license for that activity. In stating the activity did not constitute a junkyard, the court, quoting fromWest Side Metal Refining Co. v. City of Chicago, 140 Ill. App. 599,602 (1908), stated:
 "`The creating of ordinances such as the one under discussion is an exercise by the city council of the police power, and such ordinances are enacted because of the likelihood, grounded on experience, that junk may have been stolen or pilfered, and for protection against such larcenies the traffic is regulated by ordinance; and as said in City of New York v. Vandewater, 113 App. Div. 456, 99 N.Y.S. 306; so we say: "It seems clear that the general character and scope of the business of the defendant does not fall within the description of a dealer in junk. There is a radical difference between the buyer of great masses of metal weighing tons at a time * * * and one who may buy old bottles, scraps or pieces of metal, slush, old rope and the like, which might readily be pilfered or stolen and carried away secretly to be sold by the culprit. It is the business of this character which is to be licensed.'"
. . . . . *Page 563 
The court, quoting from City of Chicago v. Northern Paper StockCo., 337 Ill. 194, 168 N.E. 884 (1929), also said:
 "`The reasons requiring junk stores to obtain licenses do not apply to a business such as is conducted by the appellant, and that business does not come within the grant of power to a city to license junk stores and yards.'" (City of Chicago v. Iroquois Steel Iron Co., 1 N.E.2d at 243)
The opinion exemplifies the point we above emphasized: that the term "junkyard" is to be interpreted in a manner consistent with the overall scheme in which the definition is found. In context, we deem the ordinance to have been correctly applied by the trial court in this instance.
The corporation also contends the material retained on its property — the "processed or prepared scrap" — does not constitute junk within the meaning of the ordinance. Although Ralph Jaffe testified that the breaking of sunken barges into smaller pieces and the removal of engine blocks and wheel rims from vehicles constituted processing, this court cannot conclude that such operations place these items without the ordinance's provision of "scrap metal." We note that the record contains pictures of the scrap retained on the corporation's property. Observance of these pictures does not convince us that the material in question on the premises does not constitute junk.
The corporation also states the scrap was not "stored" on the lot. It states that the term "storage" carries with it a sense of permanence and that the mere temporary placement of the scrap on the premises while awaiting shipment to consuming mills does not constitute storage within the meaning of the ordinance. The corporation insists this case is within the scope of the holding in New York Central Railroad Company v.Ridgefield, 84 N.J. Super. 85, 201 A.2d 67 (1964). In theRidgefield decision, the court held that the temporary placement of new automobiles for a few days in a railroad yard during the process of unloading them from freight cars and reloading them on highway carriers for continued shipment was not violative of an ordinance prohibiting the outside storage of new automobiles. We do not deem that decision to be governing under the circumstances herein.
The record reveals that scrap remains on the premises for more than just a few days. Ralph Jaffe testified that space limitations require that the scrap be handled "several times" in order to relocate it on the property. We doubt that such relocation would be required were the scrap only on the property a few days. Additionally, contrary to the automobiles in Ridgefield, supra, the placement of the scrap on the Jaffe Corporation's property is not merely an interlude in shipment. It is not predestined for shipment to a given point upon arrival at the Jaffe property. The scrap accumulates until sufficient quantity is available for the corporation to contract with a consuming mill for shipment thereto.
Moreover, even if the scrap is not stored on the property, it is certainly "kept" there within the meaning of the statute.
We find no error in the decision below.
AFFIRMED.
WRIGHT, P.J., and BRADLEY, J., concur.